Commonwealth, Appellant, *v.* Bordner.

Argued April 16, 1968.   Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Vincent B. Makowski,* District Attorney, for Commonwealth, appellant.

*Roger S. Haddon,* with him *Robert M. Fortney,* for appellee.

OPINION BY MR. JUSTICE JONES, November 12, 1968:

The resolution of the issue raised on this appeal—the propriety of an order suppressing the use at trial of five statements or confessions of a person accused of murder—requires a detailed analysis and examination of the factual circumstances under which each statement or confession was given and an application to such circumstances of the guidelines, as to the admissibility of statements or confessions, set forth in recent decisions of both the United States Supreme Court and this Court.

On November 20, 1965, between approximately 10:15 p.m. and 10:30 p.m., after Paul Bordner and Mary Bordner, his wife, had retired for the evening and, while they lay sleeping, a shotgun blast injured both of them, seriously wounding the wife and superficially wounding the husband. Shortly after the shooting, a fire was discovered in the house. Mr. Bordner, mistakenly thinking it was water, threw a bucket of gasoline on the flames, and in the resulting blaze, the home was completely destroyed and seven of the Bordner children perished. The Fire Marshal, after investigation, reported that the initial blaze was of incendiary origin. Harold Eugene Bordner, the eldest child (Bordner), then aged 17 years, was severely burned in the fire and was admitted to Sunbury Community Hospital in the late evening of November 20th.

On November 21st, Bordner's attending physician prescribed one hundred milligrams of demerol for pain and also various dosages of compozene, phenobarbital, tetanus anti-toxin pavalox and akthagel, each of which drugs can affect a person's mental and emotional capacity.[1] Two officers, Rudville and Sherosick, attempted to gain permission to speak with Bordner but were refused by the attending physician, Dr. Savidge.

On November 22nd, officer Rudville questioned Bordner in his hospital room, in the presence of officer Sherosick and three hospital patients, after obtaining permission from the attending physician. This interview, which lasted from approximately 3 :00 p.m. to 3 :50 p.m., took place after the officers had questioned other members of Bordner's family concerning the crime. The questioning commenced with a general preliminary discussion with Bordner as to his home life, and then Bordner inquired as to the type of gun found at the scene of the crime. The officers showed the gun to Bordner who identified it, by touch, as his own. Bordner was then asked if he wished to make a "dying declaration" in view of his condition and if he had anything to say. He was then warned of his right to remain silent, his right to an attorney and that anything he might say may be used against him. Bordner was then asked direct questions as to whether he set fire to his parents' house and whether he shot his parents and Bordner replied in the negative. The first interview was thus concluded.

On November 23rd, the police were interviewing other family members as part of their general investigation. Later on that date, officer Rudville and the county coroner, Dr. Ulrich, interviewed Bordner once again in the hospital room and in the presence of three patients, Bordner was questioned as to some discrepan-

---

[1] On November 22nd, the drug compozene replaced demerol.

cies uncovered in the investigation up to that time and, following several minutes of routine questioning, Bordner said: "I did it, what is going to happen to me?"

Officer Rudville asked Bordner if he would talk with his mother and Bordner agreed. Bordner's mother was sent for by the police, although she was still recuperating from her wounds and had not asked to see her son, and the mother subsequently entered the hospital room and identified herself to her son. The coroner then asked Bordner to repeat his confession to his mother which the son then did. Officer Sherosick entered the room at this time in order to hear the confession. Bordner was given no warning by the police.

On the same date, November 23rd, at 6:15 p.m., the district attorney set up a guard system at Bordner's hospital room. Bordner's father entered the hospital room and requested an assistant district attorney to accompany him and the latter official stood by and listened as the father elicited from the son a repetition of self-incriminating statements similar to those previously extracted the same afternoon by officer Rudville and the coroner. A deputy sheriff left his guardpost to come into the room and listen to the conversation. Bordner admitted to his father that he wished to use the insurance money to pay his bills. The father was the only person to ask Bordner questions on this occasion, the father's motive being to assist the police.

On November 24th, the father contacted officer Rudville, advising him that he had spoken with his son the previous evening, and requested that the officer visit Bordner. The father wanted to record a subsequent visit with his son and suggested setting up a "bug" in the hospital room. While the police declined use of a "bug", they did make arrangements to record

410

a conversation between father and son on November 26th.

On November 26th, officers Rudville and Sherosick and Paul Bordner, the father, visited Bordner at his hospital room, again in the presence of three patients. At this time, a tape recorder was set up which recorded the questions and answers between father and son. Bordner unequivocally admitted the commission of the acts charged and spelled out, with specificity, the corroborating details. Bordner was questioned solely by his father although he was prompted by the police at least 46 times as to which questions to ask his son. Bordner implicated one Eugene Yerger as an accomplice in the crime. He was given no warning at all on this occasion.

On November 27th, at 8:00 p.m., the father, officers Rudville and Sherosick once again visited Bordner in his hospital room, the three patients having been removed. Bordner then admitted to his father that no one else was involved in the crime and that he did it alone. The tape recorder was then set up and, in the presence of the father, Bordner received from the officer an explanation of his constitutional right to remain silent, his right to counsel and the nature of the crime. The questions as to an understanding of Bordner's rights were directed to his father who answered in the affirmative. Bordner then related in detail the manner in which the criminal acts were committed and absolved Eugene Yerger from any participation in the crime, admitting he alone committed the criminal acts.

On November 29th, officer Rudville visited Bordner at the hospital between 11:00 a.m. and 3:30 p.m., for the purpose of obtaining clarification of an earlier statement of November 27th relating to a bucket of fluid which was on the stairway of Bordner's home

on the evening of the crime. Bordner was questioned as to this matter by officer Rudville. He was then placed in a tub for the purpose of removing old bandages and, upon seeing his hands, officer Rudville mentioned the condition of his hands to Bordner, who then said "he was dipping the gas with a meat can".

After indictment and prior to trial, counsel for Bordner made application to the Court of Oyer and Terminer of Northumberland County for the suppression of the use of any and all oral and written statements made by Bordner on the grounds such statements were involuntary and made without adequate warning as to his constitutional rights. After hearing, the court below entered an order suppressing the use of all such statements except the original oral statement on November 23rd. From that pretrial order, the Commonwealth appeals.

The Commonwealth contends that the court below erred in its findings that all of the suppressed confessions, statements and evidence in the nature thereof were made during or stemmed from custodial interrogation, when Bordner had neither been arrested, nor taken into custody, nor deprived of his freedom of action by the police in any significant way.

Bordner was first interrogated on November 22nd and the early afternoon of November 23rd. The evidence indicates that during these interrogations the police were engaged in a general fact-finding process in that they were still questioning other members of Bordner's family. Thus, Bordner was not entitled to any warning of his constitutional rights by the police at this stage and under these circumstances: *Escobedo v. Illinois*, 378 U.S. 478, 491, 84 S. Ct. 1758 (1964). Bordner suddenly admitted on November 23rd that he had done it (the crime) and asked what would happen to him. This statement, made in the presence of

a policeman and the county coroner, is captioned Statement No. 1 and, as found by the court below, is admissible into evidence even though he had not been given all the United States Supreme Court-mandated warnings as to his rights since the focus of the investigation had not yet settled upon Bordner as the accused at the time of the making of that statement. Cf. *Escobedo*, supra, p. 491.

The third questioning by the police which elicited a second incriminating confession, captioned Statement No. 2, occurred in the late afternoon of November 23rd. By the time of this confrontation between Bordner and the police, Bordner, on November 22nd, had identified a weapon found at the scene of the crime as his own and, on November 23rd, had, of course, admitted his commission of the crime to the police. It is clear beyond question that, at the time of Bordner's statements to his mother on November 23rd, the focus of the police investigation was upon Bordner as the perpetrator of the crime and, at this point, the police were bound to fully and adequately warn the accused as to his constitutional rights. See: *Escobedo*, supra, p. 491. While the record indicates that Bordner was warned of his right to remain silent, of his right to counsel, that anything he might say would be used against him and of the nature of the offense with which he was charged, he was not warned of his right to appointive counsel as now required by law. See: *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602 (1966); *Commonwealth v. Ritchey*, 431 Pa. 269, 245 A. 2d 446 (1968). The full *Miranda* warnings are specifically made applicable to the admission into evidence in trials commencing subsequent to June 13, 1966 (*Johnson v. New Jersey*, 384 U.S. 719, 732, 86 S. Ct. 1772 (1966)) and, since Bordner's trial will necessarily commence subsequent to that date, he was constitutionally entitled to

be given *all* the *Miranda* warnings whenever questioning was initiated by police or on their behalf and when he was taken into custody or his freedom of action was curtailed in any significant way. The United States Supreme Court has equated "custodial interrogation" with what it meant in *Escobedo* when it spoke of the accused being warned of his rights when the investigation focuses upon him. See: *Miranda*, supra, p. 444; *Com. v. Jefferson*, 423 Pa. 541, 546, 226 A. 2d 765 (1967). Additionally, this Court has held that custodial interrogation is not limited to police questioning or interrogation which takes place after a formal arrest. See: *Com. v. Jefferson*, supra, p. 546. Bordner was under a process of custodial interrogation while a patient in his hospital room due to the fact that the investigation had settled upon him. Such was his status prior to the time his mother was brought to see him. This finding of the court below in this respect is fully supported by the fact that, on the evening of November 23rd, Bordner was placed under a guard system which most definitely meant that he was in custody. Moreover, prior to the guard system being instituted, Bordner's condition, by reason of his injury and his medication, of course, prevented him from leaving his room of convalescence. It necessarily follows that all statements made by Bordner subsequent to and including his conversation with his mother occurred while Bordner was in custody within the meaning and intent of the *Miranda* decision.

The second issue which the Commonwealth raises in its appeal is whether the court erred in suppressing oral statements of Bordner to his mother and father, as distinguished from the proscribed statements to law enforcement officers, instead of ruling them admissible as part of a spontaneous confession of Bordner within the purview of *Miranda*, supra.

Our inquiry at this point is riveted to the question of whether Bordner was constitutionally protected, within *Miranda*, by the fact that he made his incriminating statements to his mother and father rather than to police officers even though he was in custody at the time. As previously mentioned, Bordner, on November 23rd, did make a confession to his mother in the presence of police officers at a time when he was in custody and when the focus of the investigation was upon him. See: *Com. v. Jefferson*, 423 Pa. 541, 546, 226 A. 2d 765 (1967). The facts indicate that the police asked Bordner if he would see his mother and the mother was then brought into the room at the request of the police. Neither mother nor son voluntarily requested the visit nor were they left alone with one another. On this occasion, the police gave no warning whatsoever to the accused of his constitutional rights. The police commenced the conversation between mother and son by asking Bordner to tell his mother what he had earlier in the day told them. Coupled with the additional fact that the accused was then in custody and that this was really one continuous interrogation since the police had never left, the evidence is clear that the police arranged this conversation in order to gain additional incriminating statements from Bordner by utilizing the emotional relationship between mother and son. *In viewing the totality of circumstances involved*, it can hardly be stated that these incriminating statements made to the mother were spontaneous. Cf. *Com. v. Eperjesi*, 423 Pa. 455, 469, 224 A. 2d 216 (1966). The circumstances reveal a plan on the part of the police authorities to use the mother as a police instrumentality in the interrogation of the accused son and the statements made to the mother, in the context of this factual setting, are as though made to the police themselves. As Bordner was not warned of his

rights, the incriminating statements made to his mother are inadmissible as evidence and are clearly not spontaneous. Thus, Statement No. 2 is inadmissible as evidence and the court below did not err in suppressing such statement.

The father met with Bordner on three occasions—November 23rd, 26th and 27th. Since the son was in custody, again we must examine the circumstances to determine whether the son's statements to his father were within the purview of *Miranda* in that they were not spontaneous confessions. The record indicates that at no time did Bordner and his father converse without the presence of police and additionally, there is ample evidence that the father requested the presence of the police and that his motive was to assist the police in their investigation of the accused. The undisputed testimony reveals that the father even suggested "bugging" the room of the accused son and that he was an instrumental party and moving force in tape recording two conversations with the son on November 26th and November 27th.[2]

---

[2] Other jurisdictions have concluded that, where confessions were made to third persons in the course of conversations, the confession is admissible when the third person was not an agent of the police and had not agreed to help build up a case against defendant. See: *Com. v. White*, 353 Mass. 409, 232 N.E. 2d 335 (1967), *cert. den.*, 391 U.S. 968 (1968) ; *People v. Clark*, 252 Cal. 524, 60 Cal. Reptr. 524 (1967). In *Com. v. White*, the court held that two visitors who went to see defendant in prison out of concern for his welfare were not agents of the police when defendant made a confession to them in the course of a conversation; the Court stated the police merely facilitated the visit. In *People v. Clark*, the defendant made an admission to the victim's mother that he was going to kill her son; the Court held this confession admissible since the victim's mother was not a representative or agent of the police since there was no police investigation at that time.

On November 23rd, the father met with Bordner for the first time. He had requested the presence of the authorities and his motive was to assist the police. Bordner had then been placed under a guard system. The totality of such circumstances indicate clearly that Bordner was then being subjected to custodial interrogation by a third person who was an agent of the police. Having been given no warnings as to his rights, his confession to his father, Statement No. 3, is inadmissible and we affirm the court below in suppressing it.

On November 26th, and pursuant to plans initiated by Bordner's father, the father and two police officers went to Bordner's room to tape-record a conversation. Bordner again was not warned of his rights and was not given the warning as to his right to *appointive counsel* as required when in custody. See: *Miranda*, supra, p. 444 (1966); *Com. v. Ritchey*, supra, p. 275 (1968). The father was prompted as to the questions addressed to his son on numerous occasions by the police and, for all intents and purposes, the accused was answering the questions of the police. Thus, since the father was technically an agent of the police and the son was not adequately advised of his constitutional rights, his confession, Statement No. 4, was properly suppressed as not being spontaneous under the guidelines of the United States Supreme Court. See: *Miranda*, supra.

On November 27th, the accused admitted to his father that he did it and that a person he had implicated in the November 26th interrogation had nothing to do with it. This statement was uttered to Bordner's father as soon as he came into the room with two policemen and prior to any questioning. Bordner had not been fully and adequately warned of his rights up to this time nor was he given any warning at this

time. This statement acquires its full import when it is considered against the context of the conversation of Bordner's interrogation by his father, in concert with the police, on November 26th. It is highly doubtful whether the accused would have made so immediate a statement to his father had it not been for his statement to his father of Eugene Yerger's complicity in the crime during the interrogation of November 26th. During that questioning, defendant had not been warned as to his full constitutional rights even though he was in custody and he was, in essence, being questioned by the police. The United States Supreme Court has stated that: "unless and until such warnings and waiver are demonstrated by the prosecutor at trial, no evidence obtained as a result of interrogation can be used against him." See: *Miranda*, supra, p. 479.

More recently, this Court has held that "a statement or confession made subsequent to another statement or incriminating admission obtained in absence of required warning of constitutional rights may not be used in evidence unless it is first established that the last statement was not an exploitation of the original illegality and was obtained under circumstances sufficiently distinguishable to purge it of its original taint." See: *Com. v. Banks*, 429 Pa. 53, 59, 239 A. 2d 416 (1968).

Additionally, when considering the spontaneity of Bordner's confession, we must consider the totality of circumstances. See: *Com. v. Eperjesi*, 423 Pa. 455, 469, 224 A. 2d 216 (1966). Due to the father's active collaboration with the police, the fact that the son was under fairly continuous interrogation, that the son's physical condition was critical, that he was under medication and had not been allowed to see familiar faces in the absence of the police, it is difficult

to find that the circumstances are indicative that the statement was spontaneously made. Additionally, this evidence cannot be admitted because it is the "fruit of a poisonous tree" in that it was a direct result of the unconstitutional interrogation of November 26th. See: *Com. v. Banks*, supra, p. 59.

The evidence is conclusive that, on November 27th, prior to the interrogation that elicited Bordner's fifth incriminating confession, Bordner was warned of other rights including his right to counsel. However, it is equally evident that Bordner had *never* received any warning of his right to *appointive counsel* up to and including the November 27th interrogation. As stated in *Miranda,* supra, p. 473 : "without this additional warning, the admonition of the right to consult with counsel would often be understood as meaning only that he can consult with a lawyer if he has one or has the funds to obtain one. The warning of a right to counsel would be hollow if not couched in terms that would convey to the indigent the knowledge that he too has a right to have counsel present. As with the warnings of the right to remain silent and of the general right to counsel, only by effective and express explanation to the indigent of this right can there be assurance that he was truly in a position to exercise it". See also : *Com. v. Sites,* 427 Pa. 486, 490, 235 A. 2d 387 (1967) ; *Com. v. Ritchey,* supra, p. 275 (1968). As Bordner at the time of the questioning was only 17 years of age and had not been warned of his right to *appointive counsel,* he undoubtedly would be subject to the very misapprehension as to his constitutional rights to which the *Miranda* decision addressed itself. Moreover, we have recently reaffirmed that a defendant cannot intelligently waive a right of which he is not fully aware. See: *Commonwealth ex rel. Mullins v. Maroney,* 428 Pa. 195, 236 A. 2d 781 (1968). For these reasons,

we conclude that the lower court did not err in suppressing Statement No. 5.

The last contention raised by the Commonwealth is that the court erred in suppressing Bordner's "admission" of November 29th, on the theory that such admission was voluntary in nature.

As the evidence indicates, Bordner was questioned on November 29th in the presence of one policeman and a hospital orderly who went about the course of his duties in removing Bordner's old bandages. Bordner's "admission" to the policeman that "he dipped the gas with a meat can" concededly followed a neutral remark by the policeman as to the condition of his hands. While freely volunteered statements are not affected by *Miranda* and *Escobedo*, (*Miranda*, at p. 478, *Com. v. Jefferson*, 423 Pa. 541, 545, 226 A. 2d 765 (1967)), this Court has stated that, in determining the admissibility of confessions or statements, we should consider not only the legalistic criteria propounded by the appellate courts, but also the "totality of circumstances" in each case. See: *Com. v. Eperjesi*, 423 Pa. 455, 471, 224 A. 2d 216 (1966).

The circumstances at the time of this admission were as follows: custodial interrogation had progressed ever since November 23rd; Bordner was being questioned by the same police officer who had questioned him on all but one occasion—November 23rd—and this police officer had, on November 29th, come to see Bordner for the specific purpose of clearing up discrepancies discovered in the tape-recorded interrogation of November 26th. Bordner was given no warnings as to his rights on this occasion. It is only rational to assume that the policeman knew or assumed that the condition of Bordner's hands were the result of being burned during the commission of the crime. Therefore, by commenting on the condition of Bord-

ner's hands and having just questioned him as to discrepancies of a prior interrogation, it would not be unnatural to expect that Bordner might give an incriminating answer to such a neutral remark. This is so particularly since Bordner had not seen a friendly person, in the absence of police, since the beginning of his custodial interrogation some six days before. Moreover, Bordner was in critical physical condition during this period of time.

Additionally, it must be borne in mind that this "admission" related directly to the alleged discrepancies in the prior interrogation about which he was being questioned on November 29th. This admission was directly related to the November 27th and 29th interrogations and Bordner had not been advised of his full constitutional rights on either of these prior occasions. This Court has said that a statement or confession made subsequent to another confession or incriminating admission obtained in the absence of a required warning of constitutional rights may not be used as evidence, unless it is first established that the last statement or confession was not the exploitation of the original illegality and was obtained under circumstances sufficiently distinguishing to purge it of the original taint. See: *Com. v. Moody*, 429 Pa. 39, 239 A. 2d 409, 413 (1968). Due to both the "totality of circumstances" and the fact that the original illegality was not dissipated by subsequent events, we hold that the court did not err in suppressing Statement No. 6.

We, therefore, conclude that Statement No. 1 is admissible and that Statements 2 to 6, inclusive, are inadmissible.

Order affirmed. Commonwealth to pay costs.

Mr. Justice MUSMANNO did not participate in the decision of this case.

CONCURRING OPINION BY MR. JUSTICE ROBERTS:

While I agree with the majority that Bordner's Statements 2 through 6 are inadmissible, I cannot concur with the majority's disposition concerning Statement No. 1. In my view, the admissibility of Statement No. 1 is not now properly before this Court, and I therefore believe that the Court should reach no conclusions as to it.

The Commonwealth's appeal from the pretrial order of the suppression hearing court may be entertained at this time by virtue of *Commonwealth v. Bosurgi,* 411 Pa. 56, 190 A. 2d 304 (1963), which held that the Commonwealth could appeal from a pretrial suppression order which will either cause the termination of the prosecuton or will "result in a prosecution wherein the Commonwealth is substantially handicapped because it cannot present *all* its available evidence." *Id.* at 63, 190 A. 2d at 308 (emphasis in original). The rationale of *Bosurgi* is of course that if the Commonwealth must go to trial handicapped by the loss of evidence without the right of interlocutory appeal, it will be deprived of all appellate review of the validity of the suppression order if it loses at trial. I therefore agree that this Court could properly hear the Commonwealth's appeal from the suppression order which would deprive it of the use at trial of five of Bordner's six statements.

It should be clear however that this Court can in no way properly consider Statement No. 1, which was held to be *admissible* by the hearing court. Since the hearing court ruled in favor of the Commonwealth as to Statement No. 1, it is obvious that the Commonwealth is not appealing that decision. Nor of course can the Commonwealth seek a declaratory judgment or an advisory opinion as to the admissibility of Statement No. 1. The rationale of *Bosurgi* permits the

Commonwealth to appeal to this Court from a pre-trial order *only* when it has lost at the suppression hearing and faces the loss of potentially helpful evidence perhaps without any appellate review.

Likewise, although Bordner is grieved by the pretrial decision that Statement No. 1 is admissible, *Bosurgi* explicitly denies to defendants the right of interlocutory appeal which is granted to the Commonwealth. *Id.* at 64, 190 A. 2d at 308-09. If a defendant is found guilty at trial, he of course will then be able to pursue appellate remedies.

Since neither party can properly raise the issue of the admissibility of Statement No. 1, it is clear that this Court cannot decide that issue. Since the issue is not properly before the Court in this case, I must conclude that the Court's discussion of the issue is merely unfortunate dictum. As a result, I find it unnecessary to posture this opinion as a dissent, although I am obligated to condemn the pursuit in dictum of an important issue not properly cognizable by the Court.

---

DISSENTING OPINION BY MR. CHIEF JUSTICE BELL:

I believe that the record shows that defendant had been adequately advised of his legal and Constitutional rights, including his right to remain silent, and that each and every one of his confessions were voluntarily made and should be admitted in evidence.

For these reasons, I dissent.