STATE of Iowa, Appellee,

v.

Daniel SNETHEN, Appellant.

No. 58533.

Supreme Court of Iowa.

Aug. 30, 1976.

James A. Smith, of Mike Wilson Law Firm, Des Moines, for appellant.

Richard C. Turner, Atty. Gen., David L. Brown, Asst. Atty. Gen., Ray A. Fenton, County Atty., for appellee.

Heard by MOORE, C. J., and MASON, RAWLINGS, HARRIS and McCORMICK, JJ.

McCORMICK, Justice.

Defendant Daniel Snethen appeals his conviction and sentence for first-degree murder in violation of §§ 690.1 and 690.2, The Code. Defendant contends the trial court erred (1) in placing the burden on him to prove his insanity in a hearing to determine his competency to stand trial, (2) in overruling in part his motion to suppress inculpatory statements (3) in permitting testimony of a State psychiatrist in violation of the physician-patient privilege, and (4) in overruling his motion for directed verdict on the ground of insufficiency of the evidence to show his capacity to form the intent necessary for first-degree murder. We affirm the trial court.

The murder charge arose from the brutal slaying of Timothy Hawbaker in Polk County on August 31, 1974. The State alleged defendant killed Hawbaker late that night near a levee south of Des Moines by choking him and beating him with a bumper jack.

Viewed in its light most favorable to the verdict, the evidence showed defendant met Hawbaker in downtown Des Moines during the evening involved when an automobile driven by defendant was in a minor accident with an automobile driven by Hawbaker. Defendant was driving a car owned by his halfbrother, Glenn "Luke" Foster, who was a passenger in the vehicle. Hawbaker asked Luke not to report the accident. He offered Luke and defendant a ride in his car, and they accepted. After riding around for about an hour, the trio ended up near a levee south of Des Moines, close to the site of an Iowa Power and Light Company building. Defendant and Hawbaker had been arguing. The three men left the car, and defendant and Haw-

baker began to scuffle with each other. Luke left the scene on foot because he did not wish to be involved. Defendant choked Hawbaker, struck him on the head several times with a bumper jack, and stabbed him numerous times in the chest. The blows from the bumper jack caused Hawbaker's death. Defendant dragged Hawbaker's body into a nearby cornfield, took his wristwatch, and left the body there. Defendant burned the Hawbaker automobile near the scene of the homicide.

The present charge was later brought. At the request of defense counsel, a trial was held to determine defendant's competency to stand trial. After the jury found he was not competent to stand trial, he was sent to the medical security facility at Oakdale under the provisions of § 783.3, The Code. Subsequently, in accordance with § 783.4, The Code, the director of the medical security facility reported defendant was "mentally restored" and competent to stand trial. Another competency trial was then conducted. On this occasion, the jury found defendant competent to stand trial. He was then tried and convicted of first-degree murder. This appeal followed.

I. *Burden of proof in the second competency trial.* Defendant contends the trial court erred in instructing the jury in the second competency trial that he had the burden of proving his incompetency. He took timely and adequate exception to the court's instruction on the issue.

■ Both competency trials were conducted pursuant to chapter 783, The Code. The purpose of each trial was to determine defendant's "sanity" within the meaning of § 783.1, The Code. A defendant is "insane" under that provision if he lacks mental capacity to appreciate the charge against him, understand the proceedings, and help conduct his defense. *Hickey v. District Court of Kossuth County,* 174 N.W.2d 406, 409–410 (Iowa 1970).

The burden of proving his insanity in a chapter 783 proceeding is placed on the defendant by the statute. § 783.2, The Code ("the defendant shall hold the burden of proof"). Defendant alleges this provision does not apply in a second competency trial when, as here, the defendant has met his burden in a prior competency trial to prove his insanity. He relies on the principle that when insanity is once established, it is presumed to continue until the contrary is shown, and the burden to so show is on the one who alleges a return to sanity. See *State v. Allan,* 166 N.W.2d 752, 758 (Iowa 1969).

The effect of the presumption of insanity on chapter 783 proceedings was confronted and decided in *Hoskins v. Bennett,* 256 Iowa 1370, 131 N.W.2d 510 (1964), a case not mentioned in defendant's appellate brief. The *Hoskins* case was a habeas corpus action by a prisoner who sought to upset several convictions entered in Lyon County on pleas of guilty. While the first charge against him was pending, he was found in a competency trial to be incompetent to stand trial. He was committed to the insane ward at Anamosa "until he was sane" under the provisions of § 783.3, The Code, 1958. More than a year later the staff of the insane ward found he was "mentally restored", and the warden of the reformatory notified the sheriff and county attorney of Lyon County of that fact in accordance with § 783.4, The Code, 1958. He was returned to Lyon County where his convictions later occurred.

In the habeas corpus action, Hoskins contended that the adjudication of insanity in his competency trial created a presumption of continuing insanity which should have barred acceptance of his guilty pleas until another competency trial to establish his competency was conducted.

This court held the presumption of continuing insanity is overcome and the presumption of sanity returns when a person is discharged as cured from a psychiatric facility in which he is confined after an adjudication of insanity. The court found the insane ward at the reformatory to be such a facility and the notification by the warden and subsequent procedures under § 783.4 to be a discharge upon cure. 256 Iowa at 1373–1374, 131 N.W.2d at 513.

■ The provisions of § 783.4 are the same now as they were then except that the psychiatric facility involved is the Iowa medical security facility at Oakdale instead of the insane ward of the reformatory. The principle of the *Hoskins* case is applicable here. When the director of the medical security facility notified the sheriff and county attorney that defendant was mentally restored, the presumption of continuing insanity ended and a presumption of sanity returned.

Consequently, at the time of defendant's second competency trial, the presumption of sanity was again in effect. The trial court did not err in instructing the jury in that trial in accordance with § 783.2 that defendant had the burden to prove his insanity.

II. *The motion to suppress.* Defendant attacks the trial court's order overruling in part his motion to suppress written statements which he gave law enforcement officers during the course of their investigation of the Hawbaker homicide. He raises two grounds. He contends the statements were taken in violation of his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and he contends they were not voluntary.

Applicable principles are summarized in *State v. Hilpipre,* 242 N.W.2d 306, 309 (Iowa 1976), and need not be repeated here. The basic issues are whether the State proved by a preponderance of evidence that the statements received were made by defendant after an effective waiver of his *Miranda* rights and that the statements were voluntary. These are separate issues.

■ Since this assignment of error presents federal constitutional issues, we make an independent evaluation of the totality of the evidence from which the assertions of unconstitutionality arise. We review the evidence *de novo. State v. Conner,* 241 N.W.2d 447, 453 (Iowa 1976).

The hearing on defendant's motion to suppress was fragmented, with evidence offered on three separate occasions. Witnesses for the State were John William Tinker, an agent of the state bureau of criminal investigation, Shirley Reynolds and Lewis Rhodes, deputy sheriffs, Charles Dales, police chief of Pleasant Hill, and Rodney J. Ryan, assistant county attorney. Defendant offered only the testimony of his mother, Darlene Foster.

Substantial differences exist in the testimony of the witnesses. We recite the facts we find to be established by a preponderance of the evidence. At about 5:00 p. m. on September 25, 1974, Luke Foster was picked up at his mother's Des Moines home by police officers and taken to the office of the bureau of criminal investigation in the Lucas Building for questioning with regard to the Hawbaker homicide. Darlene Foster, mother of Luke and defendant, accompanied by her husband Glenn Foster, arrived at the Lucas Building about 6:00 p. m. Luke had by then been interrogated.

When she learned Luke and defendant were suspects in the Hawbaker killing, Mrs. Foster asked the officers to bring defendant to the Lucas Building so she could talk with him. She said, "If Danny did this, he will tell me." Defendant was then being held in the Polk County jail on a separate charge. He was brought to the Lucas Building, arriving about 7:00 p. m.

Rhodes, Reynolds, and Dales were in the interrogation room with defendant's mother and stepfather when defendant arrived. Rhodes advised defendant he wanted to talk with him about the Hawbaker homicide. Defendant asked Rhodes if he realized what he was asking of him. Rhodes responded that he did and then read defendant the *Miranda* warnings. Defendant said he did not want to say anything without an attorney. Rhodes told defendant he understood and directed the officers to return defendant to the county jail.

At that point defendant's mother protested. She told defendant Luke was in serious trouble, and she urged defendant to tell the truth. Defendant told her he wanted an attorney before he would talk. Mrs. Foster asked the officers for an opportunity for her and her husband to talk to defendant without the officers present. The officers left the room for several minutes. The

record does not show what was said by the Fosters and defendant during that period.

Mrs. Foster subsequently invited the officers to return to the room. About this time Tinker arrived. With deputy Reynolds recording defendant's remarks in shorthand, defendant said he wanted to make it clear his brother was not involved in the killing but would not discuss his own involvement without an attorney present.

He then made a series of uninterrupted remarks later transcribed by deputy Reynolds as follows:

I am involved in this and my brother wasn't and I request an attorney with me throughout.

As far as my brother involved, no. I will tell all details with my attorney with me.

My brother not involved, he left. I was fighting. He left and I was fighting and no [sic] knew what had gone on. He wasn't there at the time the action took place. I am not cutting a brother loose, he left I picked him up later and took back to his car. He walked down the road and took off, he was not involved in anything. He didn't know anything happened. He knew nothing about it.

He did not have anything to do with this. I will say I am a guilty suspect in the case, but I can't admit to any murder or anything. He did not do anything. He left, I got him back and later on took the car and knew something had happened to it.

I will talk through and with an attorney. I am no animal. I have crabs and they won't even call a doctor and the whole darn cell has [crabs] and they gave us some medicine to wash with.

I will discuss from the beginning to the end when my attorney is with me.

I will state one thing, there is another suspect involved, but my brother don't know who it is. I took the knife for self protection.

The whole thing was an accident. I didn't mean to happen, it was pure accident.

After [it] happened I threatened Luke if it got out he would have to be done away with. I played on his mind.

Defendant's signed and witnessed statement containing these remarks was identified and offered as exhibit 2. Deputy Reynolds noted on the statement that after making those remarks defendant asked if Luke could be released. The officers explained this was not possible at that time because Luke's knife and car had been used and Luke had admitted being at the scene.

Defendant's mother again urged defendant to tell all he knew about the incident, "to tell the truth". Defendant responded by telling deputy Reynolds, "Okay, get your pen and take this down." Rhodes told defendant the officers would not take a statement from him detailing his own involvement in the killing unless he either had an attorney present as requested or waived in writing his right to have a lawyer present. When defendant persisted in his desire to give a statement, Tinker obtained a written waiver form and started reading it to defendant. Defendant said, "I can read it myself". He took the form, read it, and signed the "acknowledgement and waiver of rights". Thereupon defendant submitted to interrogation during which he admitted he killed Hawbaker. This detailed statement was typed and offered as exhibit 1.

The trial court sustained defendant's motion to suppress exhibit 1. The court believed the officers overcame defendant's desire for a lawyer by playing on his desire to clear his brother. The waiver was held to be ineffective under principles discussed in *State v. Moon*, 183 N.W.2d 644 (Iowa 1971). The court overruled the motion to suppress exhibit 2, the report of defendant's remarks before he executed the written waiver, but the court did order two notations which did not purport to be remarks of defendant to be excised from exhibit 2. That deletion is not at issue here.

The question is whether the trial court erred in overruling defendant's motion to suppress exhibit 2. Defendant made the remarks reported in exhibit 2 after being orally advised of his *Miranda* rights, after

expressing a desire for a lawyer and refusing to submit to interrogation without a lawyer present, after then being urged by his mother to tell the truth in order to clear Luke, and after several minutes of private discussion with his mother and stepfather.

A. *Defendant's Miranda rights.* In alleging exhibit 2 was taken in violation of his *Miranda* rights, defendant contends he was interrogated despite four separate requests for an attorney during the course of the remarks reproduced there. He does not contend that he was not advised of the rights involved or that he did not understand them. He asserts instead that his right to cut off questioning until he obtained counsel was not respected. He relies on the principle in *Miranda* that, "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." 384 U.S. 473–474, 86 S.Ct. at 1627, 16 L.Ed.2d at 723.

The Supreme Court explained the principle as follows:

"At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." *Id.,* 384 U.S. at 474, 86 S.Ct. at 1627–1628, 16 L.Ed.2d at 723.

A dispute exists in the present record regarding when and how defendant invoked his right to remain silent and his right to an attorney. Defendant offered only the testimony of his mother in the suppression hearing. Mrs. Foster testified as follows. She asked that defendant be brought to the BCI office to give the officers information which would clear her younger son Luke. When he arrived, she asked him, "Danny, what have you gotten into?" and defendant

answered, "I didn't do nothing." Then Rhodes told defendant, "Your younger brother, we have got enough on him. He's going to go to prison for the rest of his life." Defendant responded, "He didn't do it. I did it. I did it. * * * I got that dude. * * * Mom, call me a lawyer.". Mrs. Foster was too upset to notice whether defendant had been advised of his rights. Efforts to reach a lawyer were unsuccessful. Then an officer said, "Danny, just tell us in your own words what happened," after which defendant made the statements reported in exhibits 1 and 2.

■ If this testimony were credited the State could not successfully contend it met its "heavy burden * * * to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda v. Arizona,* supra, 384 U.S. at 475, 86 S.Ct. at 1628, 16 L.Ed.2d at 724. The interrogation technique attributed to Rhodes by Mrs. Foster is not nearly so subtle as that condemned in *Williams v. Brewer,* 375 F.Supp. 170, 179–183 (S.D.Iowa 1974), aff'd, 509 F.2d 227 (8 Cir. 1975), cert. granted, 423 U.S. 1031, 96 S.Ct. 561, 46 L.Ed.2d 404 (1976). Even if preceded by *Miranda* warnings, police use of the confrontation between mother and son and manipulation of their desire to exonerate Luke would put inherently coercive psychological pressure on defendant. Interrogation within the meaning of *Miranda* is not limited to the asking of questions; it includes police conduct which is calculated to, expected to, or likely to, evoke admissions. *State v. Hilpipre,* supra, at 312, and citations; *State v. Moon,* supra, at 649; *Commonwealth v. Simala,* 434 Pa. 219, 252 A.2d 575 (1969).

■ But we do not find Mrs. Foster's version of events to be credible. Rhodes testified that when defendant arrived at the BCI office he gave him the *Miranda* warnings, and defendant said he did not wish to say anything and wanted an attorney. Rhodes said he told defendant that was fine, he understood, and arranged for defendant to be taken back to jail. Defend-

ant's mother then interceded and urged him to talk with the officers. At that point, according to Rhodes, the private conversation between defendant and the Fosters took place. After talking with the Fosters, defendant made the remarks reported in exhibit 2. Although only Rhodes and Dales testified defendant initially refused to talk and requested an attorney, all State witnesses confirmed Rhodes' testimony that defendant made the remarks in exhibit 2 after a private conversation with the Fosters.

We find the preponderance of evidence shows those remarks were not induced by police conduct or questions; they did not result from interrogation within the meaning of *Miranda*. Any prompting of defendant to talk with the officers came from the Fosters and not the officers. The officers did not arrange the confrontation between the Fosters and defendant. Contrary to Mrs. Foster's testimony, Rhodes did not exploit defendant's apprehension about his brother Luke to induce the remarks in exhibit 2. We find no credible evidence of a police plan to use the mother as an instrumentality to obtain admissions from defendant. In that regard this case is distinguishable from *Commonwealth v. Bordner,* 432 Pa. 405, 247 A.2d 612 (1968).

*Miranda* does not establish a *per se* bar to admissibility of everything said by a person in custody after he once indicates he wishes to exercise his *Miranda* rights. "A reasonable and faithful interpretation of the *Miranda* opinion must rest on the intention of the Court in that case to adopt 'fully effective means * * * to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored * * *.' * * * The critical safeguard identified in the passage at issue is a person's 'right to cut off questioning'. * * * Through the exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option

counteracts the coercive pressures of the custodial setting. * * * [T]he admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored'." *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 326, 46 L.Ed.2d 313, 321 (1975).

Defendant's statements in exhibit 2 resulted from a desire to placate his mother by informing the officers his brother was not involved in the killing. They did not result from interrogation or from a failure by the officers to honor defendant's right to cut off questioning.

The situation when defendant made the statements reported in exhibit 2 was unlike that in *State v. Moon,* supra, relied on by defendant, where a person in custody was induced to sign a written statement despite his request to consult counsel before doing so. Instead, as in *Michigan v. Mosley,* supra, defendant's right to cut off interrogation was scrupulously honored, at least until after he made the remarks in exhibit 2. We need not decide whether the trial court was correct in holding the principles in *Moon* required suppression of defendant's inculpatory statements after the point at which he was told he had not said enough to clear his brother. His earlier requests for presence of an attorney were limited to interrogation regarding his own involvement in the crime; they did not extend to his statements intended to exculpate his brother Luke, and they did not require the officers to stop listening to what defendant's mother referred to as his "babbling".

The issue is not whether defendant made an intelligent decision in thinking he could successfully say enough to the officers to clear his brother without incriminating himself. The issue is whether his decision was made with full understanding that he did not need to say anything at all and could consult with a lawyer if he desired. *State v. Niccum,* 190 N.W.2d 815, 822 (Iowa 1971). As it turned out, he obviously revealed his own complicity in the offense in what he elected to say. We find the State met its

burden to show defendant understandingly waived his *Miranda* rights in the present case in making the remarks in exhibit 2.

The trial court did not err in overruling defendant's motion to suppress the exhibit on that ground.

B. *Voluntariness.* The State had the burden to prove the remarks were voluntary. In arguing that the State did not meet its burden, defendant relies on evidence of his mental abnormality, the police setting, his apprehension about his brother Luke, and his mother's urging that he tell the truth.

■ In order to establish the voluntariness of a defendant's inculpatory statements, the State must demonstrate from the totality of circumstances that the statements were the product of an essentially free and unconstrained choice, made by the defendant at a time when his will was not overborne nor his capacity for self-determination critically impaired. *State v. Cullison,* 227 N.W.2d 121, 127 (Iowa 1975).

■ Although mental abnormality is a factor to be considered on the voluntariness issue, it does not alone render statements involuntary unless it is sufficient to deprive the person involved of capacity to understand their meaning and effect. *State v. Conner,* supra, at 454. Defendant's mother testified he had a history of serious head injuries, emotional disturbance, and drug abuse. We find the evidence showed defendant was nervous and excited at the time he made the remarks contained in exhibit 2, but we do not find evidence of mental impairment sufficient to make the remarks involuntary when considered singly or with the other circumstances involved.

Similarly, although the remarks were obviously made in a police-dominated atmosphere and in a situation where defendant was feeling apprehension about his brother Luke, those factors with the other circumstances do not show his statements were involuntary.

Finally, we do not find the urging by defendant's mother that he tell the truth in order to clear Luke added enough in the totality of circumstances to make the statements involuntary. The mother did not threaten, trick or coerce defendant; she did admonish him repeatedly and strongly to tell the truth. We do not think this admonition was sufficient to overbear his will or critically impair his capacity for self-determination. Our conclusion is supported by a number of cases from other jurisdictions. See *Fuller v. United States,* 132 U.S.App. D.C. 264, 407 F.2d 1199, 1212–1213 (1968), cert. denied, 393 U.S. 1120, 89 S.Ct. 999, 22 L.Ed.2d 125 (mother questioned defendant in presence of an officer); *Duncan v. United States,* 197 F.2d 935, 937–938 (5 Cir. 1952), cert. denied, 344 U.S. 885, 73 S.Ct. 185, 97 L.Ed. 685 (wife pleaded to defendant to admit guilt so her mother would not be blamed); *Anglin v. State,* 259 So.2d 752 (Fla.App.1972) (15 year-old defendant's mother told him to tell the truth or she would "clobber" him); *State v. Alexander,* 252 La. 564, 569–570, 211 So.2d 650, 652 (1968) (defendant's mother exhorted him to tell the truth prior to his confession); *State v. Grant,* 22 Me. 171, 174 (1842) (defendant urged by a witness to make a confession to "save his brother"); *Jackson v. State,* 13 Md.App. 31, 35–36, 280 A.2d 914, 916–917 (1971) (defendant claimed he was impelled to confess to free his brother who was in custody for a crime he did not commit); *State v. Thompson,* 287 N.C. 303, 320–324, 214 S.E.2d 742, 753–755 (1975) (19 year-old mildly retarded defendant was told by his father, a police officer, to sign a waiver of his *Miranda* rights). In the totality of circumstances, we do not think the importunities by defendant's mother were sufficient to make defendant's statements involuntary.

We hold the State met its burden to prove exhibit 2 was voluntary. The trial court did not err in refusing to suppress it.

■ III. *The physician-patient privilege.* Defendant contends the trial court erred in permitting the State to use the testimony of Dr. Paul Loeffelholz in rebuttal of the defendant's insanity defense. Dr. Loeffelholz, director of the Oakdale medical security facility, examined and evaluated

defendant under court order to ascertain his competency to stand trial and his sanity at the time of the offense. Defendant alleges the testimony of Dr. Loeffelholz was given in violation of the physician-patient privilege in § 622.10, The Code.

No objection to Dr. Loeffelholz' testimony was urged on this ground at trial. Error was not preserved. We do not reach the merits of this contention.

IV. *Sufficiency of evidence.* Defendant contends the evidence was insufficient to support submission of the case. He challenged the sufficiency of evidence in his motions for directed verdict made at the conclusion of the State's case-in-chief and renewed at the conclusion of all the evidence.

He argues specifically that the evidence shows he lacked mental capacity to form the intent requisite for first-degree murder. He premises this argument on a claim the State failed to prove his sanity.

The trial court found substantial evidence existed in the record on the issue of defendant's sanity at the time of the offense and therefore submitted defendant's insanity defense to the jury, instructing the jury the burden to prove defendant's sanity was on the State. See *State v. Thomas,* 219 N.W.2d 3 (Iowa 1974). Defendant asserts he was entitled to a directed verdict on the issue. We do not agree. A directed verdict on the issue would have been justified only if the trial court was obliged as a matter of law to find a lack of substantial evidence of defendant's sanity. Evidence of defendant's insanity in this case at most raised a fact issue. Defendant was not entitled to a directed verdict on this ground. *State v. Lass,* 228 N.W.2d 758, 768 (Iowa 1975).

We find no reversible error.

AFFIRMED.