STATE of Iowa, Appellee,

v.

David Randel JUMP, Appellant.

No. 60533.

Supreme Court of Iowa.

Aug. 30, 1978.

Bennett Cullison, Jr., of Cullison & Cullison, Harlan, for appellant.

Richard C. Turner, Atty. Gen., Ray W. Sullins and Thomas A. Evans, Jr., Asst. Attys. Gen., for appellee.

MASON, Justice (By special assignment).

Defendant, David Randel Jump, appeals from judgment imposing sentence upon his conviction by a jury of the crime of manslaughter asserting that his constitutional rights were violated by the admission into evidence of statements he alleges were made involuntary as a result of psychological coercion and that the court erred in failing to give an instruction to disregard any inference defendant was untruthful or guilty because he had been given a polygraph test.

A county attorney's information was filed in the Shelby District Court January 3, 1977, charging defendant with murder in violation of section 690.1, The Code, 1976 (sic). January 10, defendant entered a plea of not guilty. February 8, defendant filed a motion to suppress the statements of sev-

eral witnesses listed in the minutes of testimony attached to the information.

This motion contained the following charge:

"That the testimony of each of said witnesses was obtained illegally by an unlawful and illegal interrogation of the defendant in violation of his constitutional rights, and that said evidence consists of reputed statements made by the defendant which were involuntarily made without having been advised of his right of counsel and without the presence of counsel or any of the members of his family and after a prolonged interrogation during which the defendant was deprived of his liberty and confined in a place without access; that the part of said testimony relates to and is the direct result of information given by the defendant and received by others herein named involuntarily while under duress and in violation of his constitutional rights."

After a hearing on this motion, it was overruled by the court.

February 28, defendant filed a motion to reopen the hearing on the motion to suppress for presentation of additional evidence. This motion was later amended to request permission to present further evidence. The court overruled this motion and the amendment thereto finding they would not change its original ruling and that they were untimely made.

Trial to a jury began March 1. During the State's evidence, it introduced testimony of Ronald Mower, a B.C.I. agent, who had conducted a polygraph examination of defendant and had interviewed him after the examination. During the examination of this witness by the State and defendant, no mention was made of the polygraph examination or its results. The first testimony concerning this examination was raised when defendant was being questioned by his attorney.

March 7, after both sides had rested, the court acknowledged that on March 6 it had received a proposed instruction from de-

fendant concerning the manner in which the jury should consider the results of the polygraph examination. The court noted it had not included this proposed instruction in its preliminary draft of instructions. It then granted defendant additional time in which to submit another proposed instruction. This proposed instruction and all previous exceptions to the instructions were then overruled by the court.

The next day the court furnished the attorneys with its final draft of its instructions. It pointed out it had not included either of defendant's proposed instructions on the polygraph examination. Later defense counsel objected to the court's refusal to give defendant's proposed instruction. The court then noted both of defendant's instructions had been timely submitted and that it had refused to give both.

March 9, the jury returned its verdict finding defendant guilty of manslaughter.

March 28, defendant filed a motion to suppress evidence, in arrest of judgment and for new trial. In this motion defendant contended his oral statements made to agent Mower and the evidence produced at trial as a result of these statements should have been suppressed because they were " * * * involuntary and obtained by duress and in violation of defendant's rights under the Fifth and Fourteenth Amendments to the Constitution of the United States, and the Constitution and laws of the State of Iowa, * * *." He also stated therein the trial court had erred " * * * in refusing to give defendant's requested jury instruction concerning the inadmissibility of evidence regarding the results of defendant's polygraph examination administered by BCI agent Ronald Mower."

This motion was overruled by the court on the same day it was filed. Later that day after a sentencing hearing, the court sentenced defendant to the Men's State Reformatory at Anamosa for a period of not to exceed eight years unless sooner released by law. The court also fined defendant the sum of $1,000.

The charge against defendant arose out of the death by stabbing of Kevin Dean Senyard. Kevin's frozen body was found on December 14, 1976, by two boys at an abandoned farmstead approximately three miles northeast of Kirkman, Iowa. The boys discovered the body inside a shed when one of them peered into the shed through a broken out window in it. In order to reach the body the boys had to remove two boards and a tin box which were blocking the doorway.

After entering the shed and determining the victim was dead, the boys returned to their home and called the Shelby County Sheriff.

The sheriff, his deputies and the boys went to the shed. Photographs were taken of the entrance to the shed with the boards and tin box having been replaced by the boys, of the inside of the shed and of the body itself.

Later that day the sheriff enlisted the aid of the B.C.I. in the investigation. Over the course of the next few days the sheriff and the B.C.I. agents investigated the stabbing. This investigation led them to believe defendant was the last person seen with the victim.

December 20, a B.C.I. agent questioned defendant at the school he attended. Defendant stated Kevin Senyard and some other boys had pushed defendant's pickup truck from a friend's house a block away to his house when it would not start. Defendant then used his mother's car to drop off the other boys and to drop off his mother at a special city council meeting. He then contended he dropped Kevin off at a local restaurant and went home. The investigator then asked defendant if he would consent to take a polygraph examination in reference to the statement he had just made. Defendant stated he would cooperate.

The next day defendant was asked to come to the courthouse for the examination. He arrived at the courthouse between 3:30 and 4:00 p. m. after he had taken his mother's car for a safety inspection. During the course of the ensuing events, defendant's mother arrived at the courthouse and asked

the officers if defendant could tell her where the keys to her car were so that she could use the car to go to a concert in which her daughter was playing. She was informed of the location of the keys and that an agent would take her son home when they were finished.

After defendant arrived at the courthouse, he was taken to a room near the sheriff's office and introduced to B.C.I. agent Mower. Mower read to defendant the standard release form used by the B.C.I. and asked defendant to explain what each of his *Miranda* rights meant to him. This form also informed him he was free to leave the polygraph room at any time. After the agent completed the reading of the form and explanation of part of it, defendant printed his name at one appropriate point and signed the form at the bottom. The form was dated December 21 and the time 4:13 p. m. was placed thereon by agent Mower. Although no further mention of defendant's *Miranda* rights was made until he was placed under arrest approximately three and one-half hours later, he was told again he was free to leave the polygraph room.

At 5:09 defendant began the first test of four he was to take. These tests varied in length from four to seven minutes and ended at 5:48 p. m.

The second of these tests, the card stimulation test, was described by Mower to be specially designed to stimulate the deceptive person and to calm the nervous truthful person. In this test the examinee is asked to pick one of five cards and keep its identity secret. He is then told he will be asked if he picked each card and he is told to answer no to each question even when the examiner mentions the correct card.

This test is rigged ahead of time by the examiner so that he knows immediately which card the examinee picks. After the cards have been called off, the examiner tells the examinee which card he lied about. Mower explained that if the person is truthful, this test is supposed to calm him down because it shows him the polygraph works. If the person is deceptive, it is supposed to

stimulate him by showing him he cannot beat the test. This test as explained was used on defendant.

After the second test agent Mower left the room. Mower stated this technique is designed to give the truthful person more time to calm down and to give the deceptive person more time to be stimulated.

After the four tests were finished, Mower left the room to analyze the results. On the basis of this analysis, he formed the opinion defendant was not telling the truth. He returned to the room and told defendant of his opinion. He stated to defendant the examination had not shown why he had been deceptive and he would bend over backwards to " * * * listen to what had taken place as opposed to just walking out and forgetting about it."

Mower then explained to defendant this might be the " * * * last opportunity or chance he might be given by myself or whatever to explain this. In other words, explain to him that if the investigators could make a case a week later or month later or whatever, it would be at that time they might not come up to him to ask him for any explanation as to what had taken place. They are not required to do that, and if they had a good case, they wouldn't possibly even be interested in what had happened other than the fact that they could prove the case."

Defendant then responded he had dreamt about the crime once. Mower told him that was interesting but they could get into the dream later because right then he wanted to know what defendant remembered doing as opposed to what he had dreamt. The only thing defendant said he could remember was standing by a tree with a bloody knife. Mower told defendant it was difficult to believe that was all he could remember.

Next, defendant told him he remembered leaving the abandoned farm, returning to the town of Kirkman and on the way nearly running into a blue car. Later, he remembered having stabbed Kevin three times, twice in the side and once in the chest. He

explained he had killed Kevin because he had threatened to reveal defendant was a homosexual.

Defendant explained to Mower that before he left the abandoned farm he took two boards off the porch of the house and placed them along with some tin object in front of the door of the shed. He stated the window of the shed was broken outward.

During the interview defendant told Mower the location of the knife. He drew a map showing this location. Later he changed the location. He also helped Mower draw a diagram showing the length and width of the knife. He explained it was a hunting knife and had a plain brown leather sheath. He did not know where he had got the knife but thought it might have been mixed up in his things when he had left his father's house in St. Louis.

After this interview defendant was asked if he would make a written statement but he refused. He was then arrested. He asked to call his father and contact his lawyer. At this point the questioning ceased.

Mower described defendant's physical condition after the interview as being as good as when he had first come into the room. He stated defendant was coherent and could answer questions clearly and intelligently.

Grant McMartin, a Harlan attorney, called by the county attorney to represent defendant, stated that when he saw defendant a short time after the interview, he appeared quite confused unresponsive and frightened, cowed or very meek. He did not know whether defendant's reaction to him was caused by his lack of trust in him. He felt defendant did not comprehend what he was explaining to him.

Defendant's mother also arrived shortly after the interview was concluded. She found her son's attitude very cold and unresponsive. When she held his hand she found it very cold. She described his complexion as ashen. Defendant told her he had had a dream that he had killed Kevin but that the officers had told him it was not a dream and that he had done it.

At the suppression hearing, defendant stated he had heard the details of the stabbing prior to his interview with Mower. He explained his mother had told him Kevin's body had been found. He had heard many other facts from town gossip and from newspaper articles. He learned the location of the stab wounds when a classmate, whose mother was an assistant of the county medical examiner, had told the entire class these facts.

According to defendant, Mower had told him he was a good polygraph subject and that he could not lie to the machine. After the test Mower told him he had lied. Mower then talked for awhile about things defendant did not understand. He was told by Mower that he would bend over backwards to help him and that if he did not tell Mower what he was thinking, he would not get another chance to talk about it. Mower told him he could leave but if he did they would suspect him and he implied they would follow him around and he would never get another chance to talk about it.

Defendant felt he could trust Mower but was still afraid. He stated the events he related to Mower were actually those that had occurred in his dream. At the time he was scared, tired and wanted to go home. He was afraid to tell that he thought himself to be a homosexual.

On cross-examination, defendant stated he knew he could leave the room. He stated he did not know he had a right to a lawyer and that he did not ask for one. He felt at the time that Mower was hounding him for information.

On redirect examination, defendant stated he did not know if Mower had told him he was his friend but he felt he had strongly implied it.

The night of the interview, the agent and the police went to the place where defendant had told Mower he had thrown the knife. They did not find it. The next day they searched again and after failing to find it, they enlisted the aid of the local

volunteer fire department members. A knife and a sheath were later found by one of these volunteers on the south side of the road at the approximate location diagramed by defendant.

On the basis of these and other facts which will later be discussed when necessary, the trial court overruled defendant's motion to suppress. The court based its ruling on the following findings:

"The Court finds that the defendant Jump was not pressured in any way to take the polygraph examination. He voluntarily talked with the officers at his high school and voluntarily proceeded to the place of the test and at no time was in custody prior to the time he made the statements and gave the confession.

"The Court finds that at the time the defendant Jump was actually administered the polygraph examination he was given first in detail his constitutional rights as set forth in Exhibit 1 and that Jump understood the rights and with knowledge of the rights he elected to continue with the examination and voluntarily signed the form consenting to the examination, Exhibit 1.

"At the conclusion of the fourth test the Court finds that the defendant was again advised he could leave the room if he desired, but the defendant elected to remain in the room and subsequently confessed to the stabbing of Kevin Senyard.

"It was not necessary that Mower readvise Jump of his constitutional rights prior to his statement. *Miranda* itself does not place this burden on police officers, and authorities which have dealt with that question hold that readvice is not required. See *United States v. Osterburg*, 423 F.2d 704 (9th Cir.), cert. den., 339 (399) U.S. 914 [90 S.Ct. 2166, 26 L.Ed.2d 571] (1970); *Miller v. United States*, 396 F.2d 492 (8th Cir.), cert. den., 393 U.S. 1031 [89 S.Ct. 643, 21 L.Ed.2d 574] (1968). This must be particularly true under the circumstances of this case where the time period between the time he was given his rights and the time he confessed is a short period of time.

"Finally, the mere fact that a polygraph examination was conducted in this case prior to Jump's confession does not, in and of itself, render this confession inadmissible as the product of coercion. See *New York v. Wilson*, 78 Misc.R.2d 468, 354 N.Y.S.2d 296; (authorities in *Wilson*); *Johnson v. State* (31 Md.App. 303), 355 A.2d 504 (Md.1976), and see *State v. Cullison*, 227 N.W.2d 121, 129 (Iowa 1975).

"The Court further finds that the admissions and confessions were voluntarily, intelligently and willfully made, and that the State has sustained its burden in proving said statements and confession by a preponderance of evidence. The defendant's choice to confess was free and unconstrained, and the Court cannot and does not find that the polygraph examination was so psychologically overwhelming that the defendant's will was overborne."

This ruling as well as that overruling defendant's previously discussed post-trial motion was appealed by defendant. He posits the following issues on appeal:

1. Should the trial court have suppressed evidence of defendant's oral statements to B.C.I. agent Ronald Mower?

2. Should the trial court have instructed the jury to disregard any inference that the defendant was deceptive or involved in the offense charged based upon a polygraph examination or the results thereof?

The State in its brief and argument responds to the issues as thus formulated.

I. Defendant contends the trial court erred in overruling his motion to suppress evidence concerning his oral statements to Ronald Mower and any other evidence obtained as a result thereof. Defendant's position in the foregoing respect is based on the assertion his confession was involuntary because of the overbearing psychological forces exerted upon him.

" * * * [W]herever a question arises whether a confession is incompetent because not voluntary, the issue is controlled by that portion of the fifth amendment * * * commanding that no person 'shall be compelled in any criminal case to be a

witness against himself.' " *Miranda v. State of Arizona*, 384 U.S. 436, 461, 86 S.Ct. 1602, 1621, 16 L.Ed.2d 694, 716, quoting from *Bram v. United States*, 168 U.S. 532, 542, 18 S.Ct. 183, 187, 42 L.Ed. 568.

When issues as to violation of constitutional safeguards are raised this court is obliged to make an independent evaluation of the totality of the relevant circumstances shown by the entire record under which ruling on those constitutional rights were made. That is, when a constitutional issue is presented, the evidence relevant to the issue is reviewed de novo. *State v. Russell*, 261 N.W.2d 490, 492 (Iowa 1978), and authorities cited.

In *Miranda* the Supreme Court clearly delineated certain procedural safeguards which were devised to inform an accused person of his right to remain silent and to assure the accused a continuous opportunity to exercise that right. *Tucker v. United States*, 375 F.2d 363, 366 (8 Cir. 1967). " * * * The prosecution may not use inculpatory statements emanating from the custodial interrogation of the accused, 'unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.' " *Id.*, quoting from *Miranda.*

■ This court has interpreted *Miranda* to require that when a person is taken into custody or otherwise deprived of his freedom of action in any significant way, he must be advised by the interrogating officer before any questioning or at the outset of the interrogation process (1) that he has a right to remain silent, (2) that anything he might say may be used in evidence against him, (3) that he has a right to the presence of an attorney, and (4) that if he cannot afford counsel he may have counsel appointed. See *State v. Davis*, 261 Iowa 1351, 1354, 157 N.W.2d 907, 908.

Before reaching the merits of defendant's challenge of the trial court's ruling denying defendant's motion to suppress we must decide as a preliminary issue the question of the effectiveness of defendant's alleged waiver of his constitutional rights and privileges.

The record discloses that prior to defendant's polygraph examination Mower explained to him his constitutional rights to counsel guaranteed by amendment 6 and his constitutionally protected privilege against self-incrimination under amendment 5 of the federal constitution in the manner enunciated in *Miranda.* Jump was asked what each right meant to him at which time he explained to Mower what his rights were. He was then given a written form containing a statement of his rights and privileges to read and asked to sign the form if it was satisfactory to him. Defendant signed this form. Mower also explained to Jump that he was free to leave the polygraph examination whenever he desired. Jump acknowledged that he understood this fact. He now attacks his waiver of those rights.

Defendant insists he did not waive his constitutional rights and privileges guaranteed by amendments 5 and 6 of the federal constitution because he should have been informed of them between the time the polygraph examination test ended and the time Mower informed him of his opinion defendant had not told the truth during the test. He maintains that when Mower told him he was lying, this was the first time a good faith explanation of his legal rights to remain silent and to consult an attorney would have been meaningful. Instead, defendant asserts Mower told him if he left he would be a suspect and that investigators would build a case against him and give him no opportunity to explain why the polygraph machine had indicated he had lied.

This court in *State v. Davis*, 261 Iowa at 1354, 157 N.W.2d at 909, made the following pertinent remarks concerning this contention:

"An accused need not be advised of his constitutional rights more than once unless the time of warning and the time of subsequent interrogation are too remote in time from one another. * * * [citing authority]."

Here, the warning to defendant was given at 4:09 p. m. and the last test ended at

5:48. Defendant made his inculpatory statements between 5:48 and 7:33 when the interview ended. Thus, less than three and one-half hours elapsed from the time of the warning to the time defendant was placed under arrest. It is to be noted Mower only told defendant of his rights at 4:09 but defendant asked for a lawyer after he had completed his interview.

In *State v. Russell*, 261 N.W.2d at 494–495, we again considered a contention similar to that raised by Jump here. After reviewing our decisions in *State v. Davis* and *State v. Cooper*, 217 N.W.2d 589 (Iowa 1974), we rejected the contention it was necessary to repeat the *Miranda* warnings under the facts presented there. We concluded that where the state has established by a preponderance of the evidence as shown by the record the accused has been advised by the interrogating officer before any questioning or at the outset of any interrogation process it is not essential for an investigating officer to repeat *Miranda* warnings prior to each and every investigation.

In response to defendant's contention the State points out the record discloses:

(1) Jump was eighteen years of age at the time of his exam and was a senior at Irwin High School, which would indicate that he possessed at least average intelligence.

(2) Ronald Mower explained in detail Jump's *Miranda* rights to him and had Jump tell him what each right meant to him. Jump's explanation of what each *Miranda* right meant to him indicates that Jump had a full understanding of his rights.

(3) There was no evidence that Jump was deceived or tricked into waiving his rights. Agent Forrest asked Jump to take the polygraph exam to confirm the truth of his story concerning his activities on the afternoon Senyard disappeared. Jump therefore knew the purpose for his polygraph exam, and was not lulled into waiving his rights by any statement made by the authorities investigating Kevin Senyard's death.

(4) When Jump realized the seriousness of his position he exercised his right to counsel. Jump's demand for counsel after orally confessing to Ron Mower indicates that Jump was cognizant of his constitutional rights throughout the polygraph examination yet chose to waive them.

■ Our review of the totality of the circumstances compels the conclusion that the State has sustained its burden of proving by a preponderance of the evidence that Jump had a full knowledge of his constitutional rights and knowingly, intelligently and voluntarily relinquished them at 4:09 p. m. *State v. Hilpipre*, 242 N.W.2d 306, 309 (Iowa 1976).

■ We find, under the circumstances presented, the interview after the tests was not so remote in time as to require an additional warning. Defendant's contention to the contrary is without merit.

II. In view of the foregoing determination we turn to the question of the admissibility of Jump's subsequent statements.

■ In this connection we point out that even though Jump initially executed a waiver of rights, it still remained the burden of the State to prove by a preponderance of the evidence his subsequent incriminating statements were voluntarily given, as a prerequisite to admission thereof as evidence against him. *State v. Franks*, 239 N.W.2d 588, 591 (Iowa 1976).

■ The accused's knowledge of his constitutional rights is a factor to be considered in the totality of the circumstances surrounding voluntariness, but it is not dispositive of the issue. *State v. Cullison*, 227 N.W.2d 121, 129 (Iowa 1975).

In support of his position his confession was involuntary because of the overbearing psychological forces exerted upon him defendant draws our attention to *State v. Cullison*, 227 N.W.2d 121 (Iowa 1975) [*Cullison II*]. There this court set down the following guidelines by which to review an issue as raised by defendant:

"No one factor is determinative of the voluntariness of a confession which neces-

sarily depends upon the totality of the circumstances of the individual case. * * * [citing authorities].

"There is no talismanic definition of voluntariness. The 'totality of the circumstances' encompasses the characteristics of the accused and the details of the interrogation process. The court determines the facts surrounding the inculpatory statement assesses their psychological impact on defendant, and evaluates the legal significance of defendant's reactions. * * * [citing authority].

"Defendant's choice to confess must be essentially free and unconstrained with his will not overborne and his capacity for self-determination not critically impaired. * * [citing authorities].

"When, as here, the inculpatory statement is the result of custodial interrogation absent legal representation for defendant the State has the burden of proving the statement was voluntary. That burden is heavy, *Miranda v. Arizona*, 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694, 724 (1966), although it is by a preponderance of the evidence and not beyond a reasonable doubt. * * * [citing authorities].

" * * *

"The crucial question as to voluntariness of the statement is whether the accused's will was overborne *at the time he confessed.* * * * [citing authority].

" * * *

"While use of polygraphic examination techniques do not *per se* render subsequent admissions involuntary, * * * [citing authority], their use must be considered as a part of the totality of the circumstances, particularly when the testing is this prolonged. [Seven and one-half hours, lasting from 11:00 p. m. to 6:30 a. m.]." (Emphasis in original). *State v. Cullison*, 227 N.W.2d at 127–129.

Defendant contends the facts in *Cullison II* are similar to those before us.

In *Cullison II* the defendant, Lybarger, was not informed when he was taken into custody in California after waiving extradition to Iowa that he was under suspicion for the murder of a Judith Pleas. He believed he was going back to Iowa to face bad check charges. Here, defendant knew at all times why the police wished to speak with him.

When Lybarger made his confession he had been awake for twenty-six hours, the last seven and one-half of which had been devoted to a lie detector test which lasted from 11:00 p. m. to 6:30 a. m. In the case before us defendant suffered from no such deprivation of sleep and the entire polygraph test took but one hour.

The total custodial interrogation of Lybarger lasted nine and one-half hours. He was not free to leave. Here, defendant was subjected to an interrogation of less than three and one-half hours and he knew he was free to leave. Although he did not have a car in which to return home he had been told by an agent that the agent would take him wherever he wanted to go when he finished with the test.

In *Cullison II* this court found physical and psychological pressure to have been exerted on Lybarger and found these pressures to have been demonstrated by his condition at the end of the interrogation. In fact, the officers were so concerned about his condition at the end that they had him hospitalized. The admitting doctor diagnosed his condition as a "probable psychologic reaction to combination of drugs and situation." *Cullison II*, 227 N.W.2d at 129. This reaction consisted of stomach pains and burning and strange mental feelings. He was very anxious and his pupils were dilated. *Id.*, 227 N.W.2d at 125.

Here, defendant was described by Mower as being in as good physical and emotional condition as when he had first come in and as being coherent and able to answer questions intelligently. Assuming Grant McMartin's and Mrs. Jump's observations about defendant were accurate, these do not rise to the level reached in *Cullison II*. Here, defendant was not suffering from any drug related condition as was the defendant in *Cullison II*.

In *Cullison II* this court considered the testimony of psychiatrists when it determined the psychological impact of the police activity on Lybarger. One doctor who had conducted an intensive month-long study of Lybarger stated his opinion that at the time of the confession Lybarger did not have the ability to make volitionally either the oral or written statements. The other doctor's testimony to the opposite effect was discounted when by his own records he had only seen the defendant for less than one hour and had not made a diagnosis of his condition. *Cullison II*, 227 N.W.2d at 129.

Here, the only evidence of a psychiatric nature was presented at the suppression hearing by Dr. Beitman. This testimony concerned the susceptibility of defendant to offers of friendship and trust. The doctor testified that based on his interviews with defendant lasting four and one-half hours in total time, he concluded defendant was very susceptible to such offers.

We find it important that neither Mower nor defendant testified Mower offered to be defendant's friend. Defendant only felt he strongly implied he wanted to be. The only statement which could be interpreted as an offer of friendship by Mower was his statement that he would lean over backwards to listen to defendant's explanation of why the examination had showed he had not told the truth. This statement clearly does not lend itself to a strong implication of friendship.

It is clear the facts in *Cullison II* are much different from those in the case before us. Defendant's reliance upon the factual similarity of that case is misplaced.

Defendant next relies upon the factual situation presented in *State v. Cullison*, 215 N.W.2d 309 (Iowa 1974) [*Cullison I*]. In the cited case the trial court had concluded the record before it established psychological intimidation when the defendant, a Mrs. Albertsen, " * * * was in the office of the chief of police and was given the alternative of either submitting to a physical examination or a polygraph examination [to determine if she had recently been pregnant], and that such alternatives were coupled with the implication the police authori-

ties wanted to 'help' the defendant prove her innocence, and were exactly within the ambit of matters that the *Miranda* case and cases following it were designed to prevent." *Cullison I*, 215 N.W.2d at 312–313.

In determining whether Mrs. Albertsen's statements were voluntary, this court cited with approval the following statements from *Schneckloth v. Bustamonte*, 412 U.S. 218, 225, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854:

" ' "The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process." * * [citing authority].

" ' 'In determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation. Some of the factors taken into account have included the youth of the accused, * * * [citing authority]; his lack of education, * * * [citing authority]; or his low intelligence * * * [citing authority]; the lack of any advice to the accused of his constitutional rights, * * [citing authority]; the length of detention, * * * [citing authority]; the repeated and prolonged nature of the questioning, * * * [citing authority]; and the use of physical punishment such as deprivation of food or sleep, * * * [citing authority]. In all of these cases, the Court determined the factual circumstances surrounding the confession, assessed the psychological impact on the accused, and evaluated the legal significance of how the accused reacted. * * * [citing authority].' " *Cullison I*, 215 N.W.2d at 314.

We find the facts in *Cullison I* dissimilar to those before us. Here, defendant voluntarily submitted himself to the polygraph examination. He was not forced with a

choice of submitting to the examination or submitting to some other type of examination as was Mrs. Albertsen.

In *Cullison I* this court determined the elements of voluntariness commented upon in *Schneckloth v. Bustamonte* were lacking in the factual situation before it. It based this finding mainly on the fact the authorities had not advised Mrs. Albertsen any statement she made to the polygraph examiner could be used against her. *Cullison I,* 215 N.W.2d at 315.

Although the holding in *Cullison I* was not based on a finding of psychological intimidation, we have applied the factors enumerated therein from *Schneckloth v. Bustamonte,* and we find none of them of significance here. Defendant was 18 years of age and a senior in high school. There was no evidence defendant was of low intelligence. He was fully advised of his constitutional rights. His detention was short. He was not subjected to any form of physical punishment.

*State v. Franks,* 239 N.W.2d 588 (Iowa 1976), is the next case relied upon by defendant. In *Franks,* this court considered the totality of the circumstances and found " * * * the record in totality reveals (1) a devious courtroom procedure, absent any shown pending charge, which avoided appointment of counsel for Franks, culminating in a subtle invitation by the prosecutor that Franks undergo a polygraph test; (2) acceptance of such invitation by the then unrepresented defendant; (3) an artful conversion of the purported lie detector test into a custodial interrogation; (4) use of a pretest technique upon which the policeman-polygraphist based an accusation that Franks was lying; (5) an attendant statement to the effect a guilty plea to an as yet unidentified charge would probably result in probation; (6) a frightened defendant who expressed the desire to consult an apparently unavailable assistant county attorney, from which emanated the non-lawyer interrogator's suggestion that he could serve as a consultant; and (7) Sidebottom's ultimate elicitation of the controverted inculpatory statements." *Franks,* 239 N.W.2d at 592.

It is clear the factual situation before us is not similar to that in *Franks.* Defendant's reliance upon this case is misplaced.

We find defendant's reliance upon the factual situations in the following cases to also be misplaced: *State v. Mullin,* 249 Iowa 10, 85 N.W.2d 598 (a friend advised the defendant to tell what he knew because he would get further with the court if he did); *State v. Ware,* 205 N.W.2d 700 (Iowa 1973) (statement to the effect it would go easier on defendant if he told the police what happened); *State v. Hilpipre,* 242 N.W.2d 306 (Iowa 1976) (defendant had stated he wanted to obtain a lawyer but when he was unsuccessful the questioning continued); *State v. Snethen,* 245 N.W.2d 308 (Iowa 1976) (defendant's mother convinced him to confess); *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424, reh. den., 431 U.S. 925, 97 S.Ct. 2200, 53 L.Ed.2d 240 (defendant persuaded to reveal location of bodies of victims by police use of his deep religious commitment).

Defendant contends it is beyond question he was subjected to powerful emotional and psychological pressures and that one of the greatest pressures was caused by defendant's belief the polygraph machine had, with scientific and unerring accuracy, branded him a liar. He contends the results of Mower's test do not show him to have been lying.

This contention is apparently based upon the testimony of Nat Laurendi, the owner of an independent polygraph firm, who testified at the suppression hearing. Laurendi testified that in his opinion the results of the tests administered by Mower were within the norm and were not indicative of deception. He also stated that if he had been confronted by a story of a dream as was Mower he would have discussed the dream with the examinee and would have asked him to return for another test dealing with reality. He testified as to the results of a polygraph test he had given defendant in which he had included in the crime questions the proviso the defendant was to speak about real life. He concluded on the

basis of these tests and all other evidence, he could not say defendant was lying in answering these crime questions.

On cross-examination Laurendi indicated that although he did not agree with Mower's use of certain measurements, he too had used them in his tests on defendant. He indicated he did not use the card stimulation test even though the school of polygraphy to which he adhered used it. He stated that on the basis of the test results alone he could not determine if defendant was being deceptive. He explained his opinion defendant was being truthful was based on the test, the case facts and everything else he knew and had observed. He admitted Mower may also have used other evidence to form his opinion defendant had not told him the truth. He stated he, like Mower in this case, also had conducted interviews with examinees after a test.

From the entire record before us, we find Mower may, indeed, have had a basis for determining defendant was being deceptive. Defendant further contends it was likely Mower misinterpreted the charts of the examination. We find no basis for this contention.

Defendant contends his psychological condition was such that Mower's various urgings to talk weakened him. As noted, the only testimony of a psychiatric nature was that given by Dr. Beitman. Beitman concluded after a total interview of four and one-half hours that any offers of friendship or trust to defendant would cause him to speak about his dream.

On cross-examination, Beitman stated he reached his conclusion on the basis of facts related to him by defendant. He admitted, however, that if those facts were false, his conclusion would also be false. He admitted it was possible defendant had lied to him but stated it was unlikely. He stated his test to determine whether a patient was truthful was not foolproof and it was possible his patients had lied to him.

In view of the fact that in the course of this opinion we have cited with approval statements of law recognized in cases cited by defendant, we deem it advisable at this point to explain the basis for our conclusion that those cases are not helpful to defendant. The question in the present case, as it was in each of the cases relied on by defendant, is whether the inculpatory statements made by the particular defendant were voluntary and thus admissible at trial. The crucial issue in each case bearing on the voluntariness of the statement was whether the accused's will was overborne at the time he confessed. In each case the court was faced in its de novo review of the totality of the circumstances with the problem whether the confession was the product of an essentially free and unconstrained choice by its maker. · In our opinion the factual findings of the courts in the cited cases as the result of their review of the totality of the circumstances warranted the courts' conclusions as to the question of voluntariness. In other words, the relevant principles of law are the same. The facts are different.

Having examined the record before us in detail, including large portions of the transcript of the hearing on the motion to suppress, we do not find any circumstances in the factual situation surrounding defendant's confession that demonstrate psychological intimidation of defendant. The psychological impact on him was not such as would vitiate his confession.

We conclude the State has demonstrated from the totality of the circumstances that the statements made by Jump following the polygraph test were the product of an essentially free and unconstrained choice made by him at the time when his will was not overborne not his capacity for self-determination critically impaired. The State met its burden to prove Jump's inculpatory statements were voluntary. *State v. Snethen*, 245 N.W.2d at 315.

The trial court was correct in refusing to suppress these statements.

III. Defendant contends the trial court erred in refusing to give either of his requested instructions dealing with the way the jury should view the evidence of the polygraph examination. He argues the

only fair procedure at trial would have been to instruct the jury to disregard any inference that defendant was deceptive or involved in the offense charged based upon the polygraph examination or the results claimed to have been disclosed to the examiner as a result thereof.

He maintains the polygraph examination was an integral part of the technique which Mower used to obtain the statements from defendant and, therefore, exposure of the infirmities of this technique was the crux of his defense at trial, this defense being the statements to Mower were involuntary and untrue. He states he had no alternative at trial but to show he had undergone a polygraph examination and to show the manner in which Mower conducted it and used the results obtained thereby to elicit the statements the prosecution claimed were made.

Before reaching this argument we must consider the State's challenge thereto. The State contends the error, if any, was not preserved for review. It argues defendant waived review of the rejection of his first proposed instruction because he neglected to except to the court's refusal to give it. It maintains error was not preserved as to the second rejection because defendant did not make clear to which instruction he was referring in his exception to the court's refusal to give his instruction.

Defendant submitted his first instruction on March 6. March 7 the court commented it had received it and granted defense counsel an additional amount of time in which to prepare a second instruction on the same matter. By March 8, the court was in possession of both requested instructions and refused to submit either to the jury.

We point out that in the trial of this case defendant was represented by Bennett Cullison, Sr., and Bennett Cullison, Jr.

After the court denied defendant's requested instruction Mr. Cullison, Jr., stated:

"The defendant has nothing further. I'd like to state again that it was the State's use of the polygraph in this case which made it an integral part of the facts surrounding the defendant's statement, and despite the fact that the results of a polygraph are not admissible in court and the defendant had no control over that state of facts and the defendant feels that at the very least the Court should instruct the jury the results of a polygraph are unreliable and inadmissible and should not be any implication to be drawn from the testimony of Mower concerning the results of a polygraph, should be disregarded by the jury."

The court then rejected the requested instruction because there was no evidence of record that agent Mower was interpreting the polygraph examination results when he stated he felt defendant had not told the truth.

At this point Mr. Cullison, Sr., stated:

"The defendant having heretofore requested an instruction submitted to the Court dealing with the use of a polygraph and the weight and credit to be given to evidence of a polygraph operator herein excepts to the Judge's—to the Court's refusal to give said instruction."

To this the court responded:

"Okay. Let the record show that the defendant previously has, in fact, given the Court two requested instructions concerning polygraph operators and interrogation and the use of lie detectors, both of which were timely submitted and submitted prior to the final draft of instructions, and I believe the Court has previously on the record refused to submit the issue to the jury on both of the requested instructions."

Later in defendant's post-trial motion, defense counsel stated:

"The Court erred in refusing to give defendant's requested jury instruction concerning the inadmissibility of evidence regarding the results of defendant's polygraph examination administered by BCI agent Ronald Mower."

■ It is apparent the problem here was caused by the fact defense counsel referred in the singular to an "instruction" instead of to the plural "instructions" in the exception and post-trial motion. Despite this problem we find the error, if any, was properly preserved as to both requested instructions.

Defendant concedes in brief and argument that evidence concerning a polygraph examination and its results is inadmissible in this state. In *State v. Conner*, 241 N.W.2d 447, 457–458 (Iowa 1976), this court held, "unstipulated polygraph evidence may not be admitted," pointing out that "a defendant's due process right to present evidence in his defense in a state criminal trial does not override 'established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt or innocence.'" Nevertheless, defendant insists he was forced to pursue this topic as part of his defense. Consequently, as stated, he argues the only fair procedure at trial would have been to instruct the jury to disregard any inference that defendant was deceptive or involved in the offense charged based upon the polygraph examination or the results claimed to have been disclosed to the examiner as a result thereof.

We are not persuaded by defendant's argument that the trial court erred in refusing to give either of his requested instructions.

Defendant raises other arguments in support of his position, some of which are of constitutional nature, but none of which were raised in the trial court. Matters not raised in the trial court or in a post-trial motion will not be considered for the first time on appeal. *State v. Pardock*, 215 N.W.2d 344, 347 (Iowa 1974); *State v. Greene*, 226 N.W.2d 829, 832 (Iowa 1975).

The trial court did not err in overruling defendant's post-trial motion.

The case is—Affirmed.

All Justices concur except ALLBEE and McGIVERIN, JJ., who take no part.