STATE of Iowa, Petitioner,

v.

Bennett CULLISON, Chief Judge of the Fourth Judicial District of Iowa, Respondent.

No. 2–57573.

Supreme Court of Iowa.

March 19, 1975.

Lyle A. Rodenburg, County Atty., for petitioner.

Smith, Peterson, Beckman, Willson & Peterson, Council Bluffs, for respondent.

Heard by MOORE, C. J., and MASON, LeGRAND, REES and REYNOLDSON, JJ.

REYNOLDSON, Justice.

The State filed petition for writ of certiorari in this court, asserting trial judge acted illegally in suppressing oral admissions and a written statement by Steven Lybarger, who was charged with the murder of Judith Pleas. We now annul the writ.

Judith Pleas' decomposed body was found near Crescent, Iowa, on October 19, 1973. She had been missing since August 10, 1973.

Lybarger was 22 years old when hearing was held on the motion to suppress. Shortly after dropping out of the twelfth grade in high school he joined the navy. Nine months later he was discharged because "he got busted for marijuana." In May 1971, two or three weeks after his discharge, he married. From that marriage he has a three-year-old daughter. He held a variety of construction jobs, none lasting more than about eight months.

In the summer of 1973 Lybarger separated from his wife and moved to Omaha. She subsequently initiated a dissolution action. By September he was being pressured to pay a number of his insufficient fund checks. Accompanied by a girlfriend, Lybarger went to California.

December 28, 1973, the Pottawattamie county district court issued a bench warrant pursuant to a county attorney's information charging Lybarger with felonious false drawing of a bank check.

February 15, 1974, Lybarger was arrested in San Francisco. He waived extradition on the bad check charge on February 20.

February 23, 1974, a Saturday, three Iowa officers took Lybarger into custody at about eleven o'clock in the morning. He was given, and acknowledged he understood, his "*Miranda* rights." Lybarger signed a waiver of those rights. They boarded a 1:55 P.M. San Francisco-Denver-Omaha flight.

During the flight Lybarger conversed with the officers and consumed two meals. No mention was made to him of either the murder or bad checks. After the plane landed in Omaha at about 8:30 P.M. (Omaha time) the group arrived at the sheriff's office in Council Bluffs about 9:00 P.M.

The officers escorted Lybarger to a conference room where, again apprised of his *Miranda* protections, he signed another waiver. Apparently it was after this he first learned the officers were investigating the death of Judith Pleas. Lybarger was never interrogated about the checks. He was told Judith Pleas was a homicide victim. He denied he knew her.

One of the officers mentioned other persons had taken a polygraph examination in the course of the investigation and may have suggested Lybarger do the same. All three officers testified Lybarger asked to take the test that night because he "felt good" and "couldn't sleep any way," despite their suggestion it wait until morning.

About 10:30 P.M. the officers called James Babbitt, a polygraph examiner employed by the county attorney's office, to administer the examination. Ultimately all went to the courthouse where the polygraph machine was located in a former magistrate's courtroom.

Lybarger and the officers ate a lunch brought to the polygraph room at approximately 11:00 P.M. Babbitt gave Lybarger his *Miranda* rights and the latter signed another waiver.

There followed a series of polygraph tests interrupted by formulation of additional questions and a break at about 2:30 A.M. so Lybarger could go to the restroom, smoke and have coffee. One of the officers later testified at this interval he asked Lybarger if he wanted to finish in the morning, and the latter allegedly said he felt good and wanted to finish it then.

The testing ended at approximately 6:30 A.M. Defendant had not made any inculpatory statements but the polygraph indicated some of his answers had been "deceptive."

The officers, informed some answers were evasive, began interrogating Lybarger in earnest. The latter testified they looked angry. Within a few minutes he was relating how he had beaten Judith Pleas into unconsciousness. Lybarger later stated he "started rattling off at the mouth more or less making statements that were not true, based on information obtained from the interrogators." At some point near the end of this interrogation Lybarger began shaking and crying. The officers, apparently alarmed, concluded he needed medical attention and took him to Mercy hospital.

Lybarger's hospital admission sheet stated "possible drug reaction or withdrawal and probable psychologic reaction to combination of drugs and situation." The hospital records show upon arrival at the hospital Lybarger complained of stomach pains and burning and strange mental feelings. He was very anxious and his pupils were dilated. He was given tranquilizers.

Lybarger had a history of drug use and claimed he had access to drugs in the San Francisco jail before his removal to Iowa. Lybarger was placed in bed with locked restraints on each ankle, his body, and left wrist, which were not removed. He slept much of February 24th. He was assigned to Dr. Mahoney, a practicing psychiatrist.

The doctor later testified he conversed with Lybarger about 10:00 A.M. on the 25th and "found nothing abnormal about him at all."

Dr. Mahoney told detective Williams (one of the officers who had been on the investigation from the outset) it would be all right to question Lybarger. Williams entered Lybarger's room and made some "small talk" until the stenographer arrived. Williams then stated his purpose to obtain a written statement and again gave Lybarger his *Miranda* rights. The latter said he understood each right. He made an inculpatory statement which was taken by a stenographer, transcribed into typewritten form with a *Miranda* warning added, read and signed by Lybarger.

From March 19, 1974, to April 25, 1974, Lybarger was psychiatrically evaluated at the Oakdale Medical Facility by Dr. Paul Loeffelholz pursuant to court order. In response to an extensive hypothetical question this doctor opined Lybarger did not have the ability at the time of either statement to make a voluntary choice between making the statements and remaining silent. In response to a similar hypothetical question Dr. Mahoney testified in his opinion Lybarger was "perfectly capable" of making both statements voluntarily.

After an extensive hearing respondent judge sustained the motion to suppress both statements. We granted certiorari on the State's petition. As this proceeding is now postured, respondent district court judge is defendant. See rule 307, Rules of Civil Procedure.

I. *Scope of review.*

At the outset we are met with a dispute over the applicable scope of review. Defendant, seeking to support the suppression ruling, asserts our review is not *de novo*, where as here there is substantial evidence to support trial court's ruling, but is strictly limited to questions of law, citing *inter alia*, Lineberger v. Bagley, 231 Iowa 937, 940–941, 2 N.W.2d 305, 307 (1942). The State contends our scope of review in an original certiorari proceeding involving such a district court suppression order is "de novo as to the totality of the circumstances," citing

several of our decisions including State v. Holderness, 191 N.W.2d 642 (Iowa 1971) and State v. Niccum, 190 N.W.2d 815 (Iowa 1971).

It must be conceded there may be reason for a difference of opinion as to the rule we apply. Compare Lloyd v. District Court of Scott County, 201 N.W.2d 720, 721–22 (Iowa 1972) with State v. Cullison, 215 N.W.2d 309, 313–14 (Iowa 1974). But there is a rationale threaded through our case law which, viewed in perspective, will harmonize most of our decisions and furnish the answer to the issue raised here.

■ Certiorari is a remedy provided by rules 306 through 319, R.C.P. This is the source of our basic rule that relief by way of certiorari shall be strictly limited to questions of jurisdiction or illegality of the acts complained of, unless otherwise specially provided by statute. Rule 308, R.C.P.; Wright v. Denato, 178 N.W.2d 339, 340 (Iowa 1970); Smith v. City of Fort Dodge, 160 N.W.2d 492, 495 (Iowa 1968).

■■ Certiorari is not an equitable proceeding. The action is by ordinary proceedings, rule 317, R.C.P., which means it is a law action. Staads v. Board of Trs. of Fireman's Ret. Pension Fund, 159 N.W.2d 485, 489 (Iowa 1968). Consequently, our review ordinarily is not de novo and we do not review fact findings of the lower tribunal further than to ascertain if they are sustained by competent and substantial evidence. Rules 334, 344(f)(1), R.C.P.; State v. District Court of Iowa, in and for Linn County, 218 N.W.2d 641, 643 (Iowa 1974).

We have reasoned there is an illegality within the meaning of rule 308, R.C.P., where there is not substantial evidence to support the findings on which the lower court or tribunal based its conclusions of law. Steinbeck v. Iowa Dist. Ct. in and for Linn County, 224 N.W.2d 469, 472 (Iowa 1974); Reed v. Gaylord, 216 N.W.2d 327, 334 (Iowa 1974).

■■ Where there is no factual dispute and no conflicting inferences may be drawn from the facts it is for us to review trial court's conclusions as a matter of law. Sueppel v. Eads, 261 Iowa 923, 926, 156 N.W.2d 115, 116 (1968). And in reviewing law issues, this court is not bound by trial court's ruling. City of Burlington v. Citizens to Protect Our Freedom, 214 N.W.2d 139, 141 (Iowa 1974); Frantz v. Knights of Columbus, 205 N.W.2d 705, 708 (Iowa 1973).

Exceptions to the above review rules have been carved out in at least two situations.

■ The first situation arises when a certiorari action is brought to challenge a contempt judgment. In review, we give weight to trial court's findings but are not bound by them. Because contempt is treated as criminal in nature, we examine the evidence, not de novo, but to assure ourselves that proof of contempt is clear and satisfactory. Lane v. Oxberger, 224 N.W.2d 245, 247 (Iowa 1974).

■ The second situation occurs when issues of violation of basic constitutional safeguards are raised. Under principles laid down in applicable federal and state decisions, such issues require an appellate court to make its own evaluation of the totality of the circumstances under which the ruling on those constitutional rights was made. Schneckloth v. Bustamonte, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854, 862 (1973); Sheppard v. Maxwell, 384 U.S. 333, 362, 82 S.Ct. 1507, 1522, 16 L.Ed.2d 600, 620 (1966); State v. Boren, 224 N.W.2d 14, 15 (Iowa 1974); State v. Winfrey, 221 N.W.2d 269, 272 (Iowa 1974); State v. Thomas, 205 N.W.2d 717, 721 (Iowa 1973); State v. Niccum, supra at 824.

■ We have held this court has the obligation to make an independent evaluation of the circumstances on all change of venue issues in criminal cases, whether the question comes to us on certiorari in advance of trial or on direct appeal following judgment. Lloyd v. District Court of Scott County, supra at 722; State v. Elmore, 201 N.W.2d 443, 445 (Iowa 1972).

■ On direct appeals in criminal cases where the issue of validity of suppression orders adjudicating the voluntary nature of confessions or inculpatory statements has been raised we examine the totality of the circumstances as shown by the record. State v. Winfrey, supra; State v. Holderness, supra at 646–47. The question before us is whether a different scope of review is to be applied in examining the same issue on certiorari, or whether we should apply the sweeping review invoked in the change of venue certiorari cases.

■ We see no good reason for a more restrictive review of facts underlying rulings relating to the voluntariness of confessions and inculpatory statements grounded on the Constitution of the United States, Amendments 5 and 14, than on review of facts underlying a ruling on a change of venue motion based on the guarantees of the Constitution of the United States, Amendments 6 and 14. There is still less reason, in our view, to hold our duty to consider alleged violations of basic constitutional rights is diminished when the issue arrives by the vehicle of certiorari rather than direct appeal.

■ We therefore determine our scope of review in this certiorari litigation is the same review followed in the change of venue certiorari proceedings where constitutional issues are raised: to make our own evaluation of the totality of the circumstances upon which the rulings rest. Necessarily, this entails an independent examination of those facts foundationing trial court's determination. Lloyd v. District Court of Scott County, supra; see Schneckloth v. Bustamonte, supra; Sheppard v. Maxwell, supra; State v. Boren, supra.

## II. *Voluntariness of oral statements.*

Trial court posited its suppression ruling on several grounds. We consider one to be controlling: defendant's involuntary oral and written inculpatory statements were obtained from him in violation of his constitutional rights guaranteed by Amendments 5 and 14 of the United States Constitution.

Applying the second scope of review exception, supra, division I, we have independently examined the totality of the circumstances surrounding defendant's statements, and reach the same conclusion trial court did.

In so doing, we have kept before us those principles of law relating to such determinations.

■ No one factor is determinative of the voluntariness of a confession which necessarily depends upon the totality of the circumstances of the individual case. State v. Cullison, supra at 314; see Checklist, 3 Wigmore on Evidence § 862, n. 11, pp. 352–54 (Chadbourn Rev., 1970).

■ There is no talismanic definition of voluntariness. The "totality of the circumstances" encompasses the characteristics of the accused and the details of the interrogation process. The court determines the facts surrounding the inculpatory statement, assesses their psychological impact on defendant, and evaluates the legal significance of defendant's reactions. *Schneckloth,* supra, 412 U.S. at 226, 93 S.Ct. at 2047, 36 L.Ed.2d at 862.

■ Defendant's choice to confess must be essentially free and unconstrained with his will not overborne and his capacity for self-determination not critically impaired. *Schneckloth,* supra; State v. Cullison, supra.

■ When, as here, the inculpatory statement is the result of custodial interrogation absent legal representation for defendant the State has the burden of proving the statement was voluntary. That burden is heavy, Miranda v. Arizona, 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694, 724 (1966), although it is by a preponderance of the evidence and not beyond a reasonable doubt. Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); State v. Fetters, 202 N.W.2d 84, 88 (Iowa 1972).

In applying the above principles in this case, we turn to those operational facts we deem most significant.

The three officers who proceeded to California timed their trip and return to arrive in Council Bluffs during hours which, according to State's brief, "traditionally are not judicial business hours." Passing for the moment the matter of instructions emanating from this court that magistrates and judges should make court service available, the officers thus found an excuse for noncompliance with the law that a defendant arrested on warrant " * * * must be taken before the magistrate or clerk without unnecessary delay * * *." Section 757.7, The Code. An appearance before a judicial officer would have provided a less potentially coercive atmosphere in which to inform Lybarger of his rights and allow their exercise. See State v. Archer, 244 Iowa 1045, 1058, 58 N.W.2d 44, 51 (1953); cf. State v. Tharp, 258 Iowa 224, 230, 138 N.W.2d 78, 82 (1965).

All available evidence indicates Lybarger was not the subject of intense police interest because of his bad checks, but as a murder suspect. However, he was neither informed of that fact nor told he was being returned to Iowa to be interrogated about a homicide, as he waived extradition and twice waived his Miranda rights. We do not agree with trial court's determination, as we read the ruling below, that the strategems employed were per se illegal and tainted all subsequent proceedings. See § 759.27, The Code; Innes v. Tobin, 240 U.S. 127, 36 S.Ct. 290, 60 L.Ed. 562 (1916); Herman v. Brewer, 193 N.W.2d 540, 546 (Iowa 1972); Annot., 94 A.L.R. 1493, 1500. We do, however, take into consideration the devious activities of the authorities in this regard as one of the circumstances relevant to the issue of voluntariness of Lybarger's statements.

After he was questioned for about an hour in a "soft" manner, Lybarger was led into taking a polygraph examination. Statements of the officers to him implied others had voluntarily been examined and as a consequence had been cleared of any complicity in the crime. Upon request Lybarger signed a lengthy document entitled "Statement of Release." This instrument contained another waiver of Miranda rights but its main purported purpose was to release the Pottawattamie county attorney and his employees (Babbitt, the polygraph officer was one) from all liability for the results of the polygraph examination.

The circumstances of this waiver are uncertain. The examiner, Babbitt, testified he merely had Lybarger read over the "release" form. Two attending officers, although not completely certain, testified Babbitt orally explained at least Lybarger's right to remain silent. In signing the release Lybarger also affirmed Babbitt had thoroughly explained the polygraph technique, a fact not supported by the record.

At 6:30 o'clock in the morning the polygraph examination ended. Lybarger had made no inculpatory statements but had been informed his answers were deceitful. He was then subjected to "hard" interrogation by three police officers with Babbitt also present.

Within a few minutes, Lybarger confessed. By the court's calculations he had then been continually awake for twenty-six and one-half hours and under more or less continual interrogation for nine and one-half hours (the last six to six and one-half on a polygraph machine) before "breaking."

In this situation, several legal concepts apply.

"Whatever the testimony of the authorities as to waiver of rights by an accused, the fact of lengthy interrogation or incommunicado incarceration before a statement is made is strong evidence that the accused did not validly waive his rights. In these circumstances the fact that the individual eventually made a statement is consistent with the conclusion that the compelling influence of the interrogation finally forced him to do so. It is inconsistent with any notion of a

voluntary relinquishment of the privilege."

—Miranda v. Arizona, supra, 384 U.S. at 476, 86 S.Ct. at 1629, 16 L.Ed.2d at 724–25.

The crucial question as to the voluntariness of the statement is whether the accused's will was overborne *at the time he confessed.* Lynumn v. Illinois, 372 U.S. 528, 534, 83 S.Ct. 917, 920, 9 L.Ed.2d 922, 926 (1963).

We consider the length of time Lybarger was without rest and the duration of his interrogation to be among the major circumstances rendering his inculpatory statements involuntary. See *Schneckloth,* supra, 412 U.S. at 226, 93 S.Ct. at 2047, 36 L.Ed.2d at 862; Reck v. Pate, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961). We have taken notice of the debilitating effect of sleeplessness on the mind in cases involving lengthy jury deliberations. See State v. Albers, 174 N.W.2d 649, 654 (Iowa 1970); Clemens v. Chicago, R.I. & P. Ry. Co., 163 Iowa 499, 508–509, 144 N.W. 354, 357–58 (1913).

While use of polygraphic examination techniques do not *per se* render subsequent admissions involuntary, see State v. Hancock, 164 N.W.2d 330, 334 (Iowa 1969), their use must be considered as a part of the totality of circumstances, particularly when the testing is this prolonged.

The physical and psychological tensions exerted on Lybarger were demonstrated by his condition when the interrogation ended. The officers were alarmed; he was immediately hospitalized. While nervousness alone would hardly render inculpatory statements involuntary, United States v. Arroyave, 477 F.2d 157, 161 (5 Cir. 1973), the admitting doctor in this instance called it a "probable psychologic reaction to combination of drugs and situation."

Finally, in considering the psychological impact of the above police activity on Lybarger, we are aided by the testimony of Dr. Loeffelholz, an expert who conducted an intensive month-long study of Lybarger

at the Oakdale facility. In his opinion, expressed in reply to a fair hypothetical question, Lybarger did not have the ability to volitionally make either the oral or written inculpatory statements.

It is true Dr. Mahoney, who saw Lybarger during his hospitalization, made a contrary psychological analysis. But while he claims to have spent as long as twenty minutes with Lybarger, this doctor made the following entry in the hospital records.

"This patient was brought to the Emergency Room on 2–24–74 at 6:50 P.M. (sic). He was transferred to Marian Wing about 7:15 P.M. (sic). I saw him briefly for a few moments prior to 2–25–74, did not do a complete examination and he was interviewed by police and taken back to jail the same day. I did not make a diagnosis and did not do a history or physical."

Dr. Mahoney admitted he would have had a better idea of Lybarger's personality and his reaction to stress had he had the time and employed procedures comparable to those used by Dr. Loeffelholz.

In reaching our determination the first oral inculpatory statements were involuntary, we do not ignore the various waivers of *Miranda* protections made hours before by Lybarger. The first and possibly the second waivers were made without any knowledge of the purpose of the interrogation. Having once made those, subsequent waivers likely assumed less significance in Lybarger's mind.

In any event, a waiver does not operate in perpetuity. The accused's knowledge of his rights is a factor to be considered in the totality of the circumstances surrounding voluntariness, but it is not dispositive of the issue. *Schneckloth,* supra, 412 U.S. at 237–38, 93 S.Ct. at 2053, 36 L.Ed.2d at 868–69. Examining the totality of all these circumstances, we hold Lybarger's oral statements were not voluntarily made.

III. *Voluntariness of written statement.*

The remaining issue relates to the validity of Lybarger's written inculpatory statement made the following day.

When faced with the question of the validity of a confession given subsequent to an illegally obtained confession the United States Supreme Court has adopted the test there must be a " 'break in the stream of events' * * * sufficient to insulate' the final events 'from the effect of all that went before.' " Darwin v. Connecticut, 391 U.S. 346, 349, 88 S.Ct. 1488, 1490, 20 L.Ed.2d 630, 634 (1968); Beecher v. Alabama, 389 U.S. 35, 88 S.Ct. 189, 19 L.Ed.2d 35 (1967); Clewis v. State of Texas, 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967). These cases indicate time alone is not a sufficient intervening factor.

Here time and drug-induced sleep intervened. But we hold even these factors coupled with perfunctorily-given *Miranda* rights are not sufficient to validate the written statement. Several counter-balancing circumstances influence our conclusion. First, Dr. Loeffelholz's testimony went directly to this point. He opined Lybarger did not have the ability to volitionally make this written statement. He testified in effect Lybarger was emotionally broken by the first oral inculpatory statements. Second, when this statement was obtained from Lybarger he had been in custody for ten days without an opportunity to communicate with anyone but police and hospital personnel. Denial of access to the outside world continued throughout. See Darwin v. Connecticut, supra, 391 U.S. at 349, 88 S.Ct. at 1490, 20 L.Ed.2d at 633.

A third major circumstance is the fact Lybarger was hospitalized. He was confined to a bed, never permitted to leave it, and continually clamped in four locked restraints around his ankles, body, and left wrist, until after he made the statement. Dr. Loeffelholz testified, "In the local hospital he was put in restraints, and any individual who is placed in a psychiatric hospital or any hospital for that matter, has a tendency to comply with expectations. There is a greater tendency to comply if you have restraints on you."

Lastly, we note the written statement itself carries some indication of state of Lybarger's mind when it was taken. A portion states,

" * * * As far as anybody else being with me, I can't—I don't think we did. I just don't know whether I did or didn't. From there was night, I guess.

"I don't know if I had my car or my bike but probably a car, I don't know, my car was screwed up after Rhonda left. It might have been a bike. I remember being out there. We were goofing around, I think it was my car. * * *."

Dr. Loeffelholz testified, " * * * this is not his usual way of speaking, if these are his words; they are words said in a rather highly stressful state * * *." The language of the statement does not persuade one it is "the product of a rational intellect and a free will." Blackburn v. Alabama, 361 U.S. 199, 208, 80 S.Ct. 274, 280, 4 L.Ed.2d 242, 249 (1960).

It is apparent to us the events surrounding this written statement were not sufficiently insulated from the prior events which occasioned the oral inculpatory statements. The coercion of the first oral statements infects it. We hold it too was properly suppressed.

The writ of certiorari is annulled. This case is remanded to district court for further proceedings.

Writ annulled.