**STATE of Iowa, Appellee,**

v.

**Debra OLIVER, Appellant.**

**No. 68664.**

Supreme Court of Iowa.

Nov. 23, 1983.

Clark L. Holmes, Des Moines, for appellant.

Thomas J. Miller, Atty. Gen. and Roxann M. Ryan, Asst. Atty. Gen., for appellee.

Considered by UHLENHOPP, P.J., and HARRIS, McCORMICK, LARSON, and SCHULTZ, JJ.

LARSON, Justice.

This defendant appeals from her conviction of second-degree murder, Iowa Code section 707.3. She alleges error in (1) admitting a confession made by her during

and after a polygraph examination, contending it was the product of deception; (2) admitting evidence seized from her apartment on the ground it was illegally seized; and (3) admitting photographs, bloody clothing and other items of evidence allegedly so gruesome and inflammatory as to be inadmissible. We affirm.

The body of Charles Leon Kimsey, Jr., was discovered in his apartment at about 11 a.m. on April 2, 1981. The victim's hands and feet were tied with telephone cord, a fact which became pertinent in later proceedings. A blanket covered most of the body, and a butcher knife was stuck in the upper back of the body protruding through the front. There was a gag in the victim's mouth and a shoestring around his neck. The investigating officers found an I.O.U. in the victim's apartment which eventually led to Terrance Oliver, this defendant's brother. A witness told police that Debra Oliver often accompanied her brother. The victim's car was found approximately seven blocks from Debra's apartment.

Police records showed an outstanding arrest warrant for Debra Oliver on an unrelated theft charge. She was arrested at her apartment at about 4 p.m. on April 3, 1981, on the basis of the arrest warrant. She was also questioned at that time regarding the murder.

## I. The Confession.

Following her arrest, Oliver was taken to the police station, given *Miranda* warnings, and questioned. She denied any knowledge of the victim or the murder. She claimed she had not even been with her brother that night. Because the police had reason to suspect she was lying, based upon their interrogation of other persons, they asked her if she would be willing to take a polygraph examination. She agreed. Officer Leeper administered the test, beginning with obtaining Oliver's signature on a document that instructed her that the test was voluntary and that she could leave the room at any time. It also included *Miranda* warnings. A pretest

procedure (asking Oliver to pick one of five cards, then answer "no" each time Leeper asked if this one was the one she had picked), indicated that Oliver would be difficult to test. Leeper was, however, able to tell which card was picked, demonstrating to Oliver that the machine worked. Leeper then asked Oliver, in five separate questions, which of five objects had been used to tie the victim. In contrast to the "truthful" reaction he received on mentioning the other four objects, he obtained an "inconclusive" reaction when the telephone cord (which he knew had been used) was mentioned.

Leeper then went around the desk, beside Oliver, and talked to her. There is some dispute about exactly what was said. Leeper claims he said that "there are problems with the test" and that Oliver may have concluded from that statement that she had failed the test. Oliver claims he told her the machine "went haywire" and that he knew she had lied. In any event, Oliver broke down, cried, and then confessed. Leeper took her back to the detectives who obtained, after another round of *Miranda* warnings, a full confession on tape.

Oliver attacks the confession on the ground the polygraph examination, which she claims had been administered in a deceptive way, had the effect of coercing her confession. Specifically, she claims the operator misled her by claiming the test had conclusively shown she lied when denying knowledge of the telephone cord, where in fact the test was merely "inconclusive" on that question. Oliver seeks to strengthen her claim of involuntariness by asserting that her fear of her brother and her emotional state at the time made her especially susceptible to psychological coercion, and that this vulnerability heightened the coercive effect of the police use of the polygraph examination.

In response, the State argues the statements were voluntary and therefore admissible. First, it claims there were four sets of *Miranda* warnings given to the defendant and testimony established her to be an intelligent person, capable of under-

standing the warnings and knowingly waiving her rights. Second, the State argues, there was no deception. From the investigating officers, Leeper knew that a telephone cord had been used. From an earlier polygraph examination of Lori Avon, Oliver's roommate, Leeper knew that Oliver had told Avon that Terry had tied Kimsey with telephone cord and then stabbed him. Therefore, when Leeper told Oliver there were problems with the test and that he didn't believe her he was not lying. He had independent support for his doubts, which he simply did not disclose. The State contends that even if there was deception, it is not the kind of deception that renders the confession in this case involuntary, as deception is only one factor used in determining voluntariness.

In a very detailed ruling, the trial court found the confession to be voluntary. Essentially adopting the State's argument, the court concluded that this deception, to the extent it was deception, would not invalidate the confession in the absence of other factors.

■ Because constitutional rights are involved, our review is de novo; we make an independent evaluation of the totality of the circumstances as shown by the entire record. *State v. Hodges*, 326 N.W.2d 345, 347 (Iowa 1982); *State v. Aldape*, 307 N.W.2d 32, 38 (Iowa 1981); *State v. Jump*, 269 N.W.2d 417, 423 (Iowa 1978); *State v. Cullison*, 227 N.W.2d 121, 127 (Iowa 1975). *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), was a fourth amendment case; nevertheless, it looked to confession cases under the fifth amendment in determining "voluntariness" of a search consent. *Id.* at 223, 93 S.Ct. at 2045, 36 L.Ed.2d at 860–61. The Court, acknowledging a need for balancing the societal interests of successful crime investigation and the rights of an accused, said "[V]oluntariness" has reflected an accommodation of the complex of values implicated in police questioning of a suspect. At one end of the spectrum is the acknowledged need for police questioning as a tool for the effective enforcement of criminal laws.... Without such investigation, those who were innocent might be falsely accused, those who were guilty might wholly escape prosecution, and many crimes would go unsolved. In short, the security of all would be diminished.... At the other end of the spectrum is the set of values reflecting society's deeply felt belief that the criminal law cannot be used as an instrument of unfairness, and that the possibility of unfair and even brutal police tactics poses a real and serious threat to civilized notions of justice. "[I]n cases involving involuntary confessions, this Court enforces the strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will." *Blackburn v. Alabama*, 361 U.S. 199, 206–207, 80 S.Ct. 274, 279–280, 4 L.Ed.2d 242.

(Citations omitted). *Bustamonte*, 412 U.S. at 224–25, 93 S.Ct. at 2046–2047, 36 L.Ed.2d at 861.

■ When a defendant challenges a confession as involuntary, the State must show voluntariness by a preponderance of the evidence. *State v. Cooper*, 217 N.W.2d 589, 595–96 (Iowa 1974). *See Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 627, 30 L.Ed.2d 618, 627 (1972) ("at least" a preponderance of evidence required).

Language in *Miranda* ("any evidence that the accused was threatened, tricked, or cajoled into a waiver [of fifth amendment privilege] will, of course, show that the defendant did not voluntarily waive his privilege") *Miranda v. Arizona*, 384 U.S. 436, 476, 86 S.Ct. 1602, 1629, 16 L.Ed.2d 694, 725 (1966), and in *Cooper* ("Deception of any nature by representatives of the state cannot be condoned") 217 N.W.2d at 597, indicates disapproval of deceptive interrogation tactics. No per se rule of exclusion, however, has been adopted; deception is merely considered as one of the factors in considering the overall question of voluntariness. *Id.*

In the present case, the polygraph operator virtually conceded deception in the administration of the test. While he did not recall telling Oliver that the machine "went haywire" on her response to the telephone cord question, he admitted that he might have done so. A reasonable interpretation of the evidence, we believe, must lead to the conclusion that, to the extent the inculpatory effect of the polygraph was overstated to Oliver, she was misled. She contends that the polygraph test, with its aura of infallibility, coupled with her own susceptibility to coercion, require exclusion of the confession which followed. A psychologist testified to the effect of the polygraph:

> Here we have electronic instrumentation taking recordings of physiological measurements, respiration rate, plethysmograph rate, galvanic skin response. Typically, the individual is hooked up to the machine. It certainly has all the—the trappings of scientific measurement. It has been widely held out, I think, to the laity that it's a highly valid—and again I hate to belabor a word, but virtually infallible means of detecting deception against which the individual is well-nigh powerless, you see, to resist or withhold, and therein lies its, in my judgment, coercive power effect.

It appears from the transcript of Oliver's confession that the results of the polygraph examination weighed heavily in her decision to confess. In answer to the officer's question as to why she was giving the statement, she said the operator had told her that her answer to the telephone cord question caused a "reaction" on the machine, that "he could tell that I knew something about [the cord]" and "made it sound like I was already caught...."

While, as we have stated, appellate courts have disapproved of deceptive police practices, they have been reluctant to find that confessions were not voluntary when examining the totality of the circumstances. *State v. Cooper*, 217 N.W.2d 589 (Iowa 1974) is typical of the majority view. There the defendant, after *Miranda* warnings, confessed to a shooting. During a break in one interrogation, the assistant county attorney had learned that the victim had died. Earlier in the interview, defendant had inquired about the victim's condition, and the assistant county attorney had truthfully replied that he did not know. Later, when the defendant again inquired, the prosecutor again said "I don't know," even though he had just learned of the death. This court held that this deception had not rendered the confession involuntary, using the totality of circumstances approach. *Cooper* noted cases from other jurisdictions which have gone both ways on the question of voluntariness in the face of deception. In *Rogers v. Richmond*, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961), an officer's untruthful representation that the defendant's wife would be arrested if he did not testify voided his confession; and in *Spano v. New York*, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959), a false representation that the defendant's friend would lose his job if the defendant did not confess was held to be coercive.

Two Iowa cases also resolved the issue in favor of the defendants. In *State v. Franks*, 239 N.W.2d 588 (Iowa 1976), defendant, who denied knowledge of a crime, was asked to take a polygraph. After the usual background "pretest" the examining officer told defendant that he (the officer) would be going to court for or against defendant, that in his opinion, defendant was lying, and that if he pled guilty he would get off with probation or a suspended sentence. It was disputed whether the officer said defendant would get twenty years if the case went to trial. Defendant also, at that point, asked to talk to an assistant county attorney again but was told he was unavailable. Defendant then gave an inculpatory statement. At the suppression hearing, defendant testified that he had been intimidated and had given a statement because "probation ... [is] better than going to jail even if you are innocent." This court concluded that the statement was not voluntary. 239 N.W.2d at 590–91.

Among other actions in the case, this court cited as reasons why the confession was not given voluntarily: "an artful conversion of the purported lie detector test into a custodial interrogation," "use of a pretest technique upon which the policeman-polygraphist based an accusation that [defendant] was lying," and the officer's "ultimate elicitation of the controverted inculpatory statements." 239 N.W.2d at 592.

In *State v. Cullison,* 227 N.W.2d 121 (Iowa 1975), the defendant had waived extradition from California on a bad check charge. He was not told he was suspected in a murder investigation. He was given *Miranda* rights, and he signed a waiver. During the flight from California, no mention was made of either the bad checks or the murder. Upon arrival in Council Bluffs, at about 9 p.m., defendant was again given *Miranda* warnings and again signed a waiver. Only after this occurred did he learn about the murder investigation. He was never asked about the checks. After a suggestion regarding a polygraph examination, defendant asked to take one. An examiner was summoned, who started with another round of *Miranda* warnings and a signed waiver. One of the officers testified that during a break at about 2:30 a.m., he asked defendant if he wanted to finish in the morning, but defendant wanted to finish then. The testing ended at about 6:30 a.m. Defendant had made no inculpatory statements, but the polygraph indicated some of his answers had been "deceptive." Learning this, the officers began interrogation in earnest. Within a few minutes, defendant was confessing to the murder. The trial court sustained a motion to suppress.

This court in *Cullison* disapproved of the tactic of not informing the defendant of the real reason for his extradition. While not finding per se illegality, the court stated it would "take into consideration the devious activities of the authorities in this regard as one of the circumstances relevant to the issue of voluntariness...." 227 N.W.2d at 128. Other circumstances, including the lack of explanation about the polygraph and especially the length of time defendant

had then been awake and the length of the time under questioning were also noted.

"While use of polygraphic examination techniques do not *per se* render subsequent admissions involuntary, see *State v. Hancock,* 164 N.W.2d 330, 334 (Iowa 1969), their use must be considered as a part of the totality of circumstances, particularly when the testing is this prolonged." *Cullison,* 227 N.W.2d at 129.

Both *Franks* and *Cullison* make the point that *Miranda* warnings are not per se determinative. "[E]ven though [defendant] initially executed a waiver of rights, it still remains the burden was upon the state to prove by a preponderance of the evidence defendant's subsequent incriminatory statements were voluntarily given, as a prerequisite to admission thereof as evidence in chief against him. (Citations omitted)" *Franks,* 239 N.W.2d at 591.

The American Law Institute, in its Model Code of Pre-Arraignment Procedure, notes the widespread use of deceptive practices in obtaining confessions. It notes the strong arguments which can be made for and against admissibility of the resulting confessions. On one hand it notes the "dirty business" of officers' "resort[ing] to tactics which violate the standards of dignity and probity for the conduct of government or society generally" and the resulting cynicism of the public at large. On the other hand, it notes that "the control of crime involves officials with persons who have manifested a willingness to do violence to even the most elemental decencies, and effective measures of control must take this into account" *Id.* at 355–56. The model code, in its first draft, had explicitly barred confessions resulting from false statements concerning the strength of the case against a suspect, a practice perceived by the reporters to be the most common form of deception (and the type of deception claimed here). It noted, nevertheless, that courts generally have refused to adopt a per se rule of exclusion. A rule of per se exclusion is not a part of the model code in its present form. Instead it requires that

deception be considered by a court, together with other circumstances to determine if there was an improper inducement to make the statement. The model code now provides:

> No law enforcement officer shall attempt to induce an arrested person to make a statement or otherwise cooperate by
>
> (a) questioning of such unfair frequency, length or persistence as to constitute harassment of such person; or
>
> (b) any other method which, *in light of such person's age, intelligence and mental and physical condition, unfairly undermines his ability to make a choice whether to make a statement or otherwise cooperate.*

(Emphasis added.) Model Code of Pre-Arraignment Procedure, *supra,* § 140.4.

The comment of the final draft notes the rule of the original draft, then states:

> Nevertheless, [state and federal] courts presented with this kind of deception have upheld the admissibility of any resulting statement, *except to the extent they have found that making the suspect believe his situation hopeless, combined with other circumstances, constitutes coercion.*

(Footnote omitted) (emphasis added). A.L.I. Model Code of Pre-Arraignment Procedure, Commentary, at 357.

Section 140.4 of the model code further refines the rule as noted in *Cooper,* that "deception becomes a factor to be considered in reviewing the totality of the circumstances," 217 N.W.2d at 597, and we look to it in assessing Oliver's constitutional challenge.

At the outset, we note that the "deception" complained of was not as egregious as the defendant claims. It is true the operator overstated the strength of the polygraph showing of guilty knowledge concerning the killer's use of a telephone cord, but it must be remembered that he had other knowledge, independent of the polygraph, that she was lying. Oliver's roommate had already told the officers of Oliver's detailed account of the killing, including the use of the cord.

Moreover, the circumstances of this case do not indicate an undermining of Oliver's "ability to make a choice." Applying the test of the model code, we note the record reveals Oliver was nineteen at the time of the arrest and had completed the 11th grade in high school. Her psychologist witness testified she was "a bright young woman with an above-average intellectual ability." She was not shown to have any physical or mental impairment which would bear on her ability to make an informed decision on waiver. Moreover, the circumstances of her confinement and interrogation, in contrast to *Cullison* and *Franks* were neither so prolonged in duration nor intense in their nature as to cast suspicion on their fruits. The polygraph test lasted less than an hour, including the pretest procedures and the "discussion" which followed the test. The taped confession followed immediately and lasted less than an hour and a half.

Our de novo review leads us to the conclusion that the nature of the deception and the defendant's own circumstances do not demand suppression of the confession.

Oliver contends that she was uniquely susceptible to police coercion because of her fear of her brother, who actually committed the murder. This contention is based solely on her own statements and the testimony psychologist witness, based on her statements to him. We conclude the evidence as a whole does not bear this out but in fact shows she was not subject to such pressure as to undermine her ability to make a choice under the test of the model code.

## II. *Admissibility of Seized Items.*

When the police initially went to Oliver's apartment to execute the arrest warrant on the unrelated theft charge, they seized a television set which matched the description of the set missing from the victim's apartment (a 17–19″ Motorola Quasar). Following her confession, police returned

to the apartment and seized a sweatshirt, a pair of shoes, and other items.

Insofar as the second search is the product of the confession, admissibility turns on that issue, and we have resolved that against the defendant. With regard to the television set, Oliver argues the trial court erred in admitting the evidence because the police had no search warrant and the plain view exception did not apply for two reasons: the police used the outstanding arrest warrant as a pretext; and the police did not have permission to enter. Oliver also argues there was no "probable cause" to believe the television set was the victim's, as it was an ordinary model, and they had no specific identifying information at that time.

The State argues that the police went to the apartment with the dual purpose of arresting Oliver on the theft charge and of questioning her about the murder. Because the outstanding warrant was valid, the State continues, there was nothing improper about the police serving it at this time. The State also argues that the police were invited into the apartment by Oliver's roommate, Lori Avon.

In considering the admissibility of such evidence, we start with the premise that all searches and seizures must be conducted pursuant to a search warrant issued on probable cause unless circumstances are shown to excuse compliance with that constitutional restriction. *Coolidge v. New Hampshire*, 403 U.S. 443, 453, 91 S.Ct. 2022, 2031, 29 L.Ed.2d 564, 575 (1971). Among the recognized exceptions to the rule is the plain view doctrine. *State v. Schrier*, 283 N.W.2d 338 (Iowa 1979); *State v. Jackson*, 210 N.W.2d 537, 539 (Iowa 1973). This is the exception the State urges here.

In the absence of a warrant, the burden is on the State to demonstrate that the actions were lawful. *State v. Ege*, 274 N.W.2d 350 (Iowa 1979). In order to support a seizure under the plain view doctrine, the State must show inadvertent discovery, plain view, and that the incrimina-

ting nature of the seized materials is immediately apparent. *Coolidge*, 403 U.S. at 464–73, 91 S.Ct. at 2037–42, 29 L.Ed.2d at 581–87. In addition, the State must show that the intrusion was legitimate. *State v. Findlay*, 259 Iowa 733, 145 N.W.2d 650 (1966).

This court's review of the plain view question begins with the recognition that review of such a constitutional claim is de novo. *State v. Roth*, 305 N.W.2d 501, 504 (Iowa 1981).

Lori Avon testified at trial that she was sleeping on the living room floor in her apartment when the police arrived. According to her, the first thing she knew the police were already standing in her apartment. The police, on the other hand, testified they arrived, knocked, and responded "the police" to a call of "who is it?" from inside. When nothing happened, one of the detectives opened the unlocked door 8–10 inches, revealing Lori on the floor. He called "Lori," and she responded by telling them to come in.

The trial court accepted the police version of the facts and found that the police had a legal right to be in the apartment; therefore, the plain view exception applied. We reach the same conclusion. Whether the police were there for the purpose of serving the arrest warrant or to question Oliver about the murder investigation in which her name had been mentioned, their entry into the apartment was by consent and therefore legal. We proceed to consider the remaining elements of the plain view exception.

The State's showing that the television set was in plain view of the officers is not challenged by Oliver. In addition, the required showing that the incriminating nature of the evidence was apparent to the officers cannot be seriously disputed by Oliver. The victim's automobile was found about seven blocks from Oliver's apartment. The size, make, and model description of the television set matched that known by the police to be missing from the victim's apartment. There was another television set on the floor nearby, and Oliver

had brought the newer set home at about the time of the murder.

The State has sustained its burden of proving the legality of the seizure.

### III. *Admissibility of the Pictures, Shirt, Etc.*

The State was allowed to introduce the bloody shirt of the victim, the butcher knife with which he was stabbed, the shoestring with which he was strangled, and six photographs of the corpse.

Oliver asserts that the prejudice outweighs the probative value, indeed that there is no probative value at all where the manner and method of the killing were never contested. She contends that, because her defense was that she was forced to participate through fear of her brother, the pictures and other items were not relevant as to her. Oliver suggests that prejudicial pictures be permitted only if they are probative and if the matter cannot be shown in some other, less prejudicial way.

■ This court's review is limited. The Iowa cases are unanimous in according the trial court considerable discretion. As we said in *State v. Chadwick*, 328 N.W.2d 913, 916–17 (Iowa 1983),

> [t]he test for admission of such evidence is two-fold: (1) the evidence must be relevant and (2) if the evidence is relevant the trial court must determine whether the probative value of the exhibits outweighs the prejudice which would be caused by their admission into evidence.

(Citation omitted.) *Accord, State v. Hickman*, 337 N.W.2d 512, 515–16 (Iowa 1983); *State v. Aswegan*, 331 N.W.2d 93, 97 (Iowa 1983).

■ The State argues that the photographs were probative of the elements of malice, premeditation, deliberation, willfulness, and specific intent to kill. The shirt was relevant for the same reasons, and also to show the time and cause of death. (The shirt was identified as the one Kimsey was wearing on the day of the murder; the amount of blood on the shirt showed Kim-

sey was still alive when the wound was inflicted.)

It is true that this defendant did not challenge the State's proof of the elements of murder, but merely claimed she was forced to participate. The jury was not obliged to limit her culpability by the extent of her own state of mind, however; it could also have found her guilty as an aider and abettor, which makes the state of mind of her principal relevant as to her.

We believe the evidence in question probative to show the necessary elements of murder, and although the exhibits were gruesome, any prejudice in admitting them did not outweigh their probative value. The court did not abuse its discretion in admitting them.

Having found no reversible error, we affirm the conviction.

AFFIRMED.