**STATE of Iowa, Appellee,**

v.

**Donald Thane KING, Appellant.**

**No. 91–712.**

Court of Appeals of Iowa.

Aug. 27, 1992.

Linda Del Gallo, State Appellate Defender, and B. John Burns, Asst. State Appellate Defender, for appellant.

Bonnie J. Campbell, Atty. Gen., Thomas G. Fisher, Jr. and Thomas H. Miller, Asst. Attys. Gen., and Michael P. Short, County Atty., for appellee.

Heard by OXBERGER, C.J., and DONIELSON and SACKETT, JJ.

DONIELSON, Judge.

Donald Thane King was upset that Ed Branch was dating King's half sister. On November 20, 1990, finding Branch at his half sister's home, King jumped on him, repeatedly stabbed him in the chest with a kitchen knife, and continued to kick him in the ribs and head while being pulled off. Branch died as a result of the attack and King was later convicted of first-degree murder. King now complains his murder conviction should be reversed, alleging his waivers of rights and confessions were not knowingly and voluntarily given. He also complains his trial counsel rendered ineffective assistance in defending him. We affirm.

On November 17, 1990, Branch was visiting Susan Helmick, King's half sister, at her house when King arrived and told Branch to leave several times, indicating that he did not want Branch to date Helmick. Branch refused to leave and King pushed him through the front door. The scuffle between Branch and King then had to be broken up.

Later that evening, Tena Evans, a bartender at the Two of a Kind tavern, overheard King and a friend, Steve Chaney, talking about Branch, to whom they referred as "Mr. Ed." King commented he was not through with Branch yet. He stated that he was going to kill him or teach him a lesson.

On November 20, King and Branch arrived separately at Helmick's house at around one o'clock in the morning. The two had been drinking, and King told Branch, "Leave Susie alone, or something is going to happen." Ignoring King's warning, Branch attempted to ascend the stairs, but King pulled him back, wrestled him to the ground and placed him in a headlock. After the fight had made its way into the kitchen, Branch was able to grab his coat and leave. King grabbed a knife from the kitchen and ran outside in pursuit.

In the yard, King repeatedly threatened Branch with the knife and exclaimed, "I'm going to slit your neck open." Branch threw a child's folding chair toward King and fled. King, still wielding the knife, told Chaney, who was standing nearby, "He tried to kill me. I'm going to kill him." King then proceeded to chase Branch down.

Branch stumbled and King fell on top of him, repeatedly plunging the knife into Branch's body. Branch went limp, and Chaney pulled the two apart, telling King, "That's enough." King dropped the bent knife but continued to punch Branch's limp body as Chaney pulled him off. Chaney pushed King toward his car, but King turned, ran back to his victim, and began to repeatedly kick Branch in the head and ribs. King again picked up the knife, but on hearing Chaney's warning that "The cops are coming," King jumped into Chaney's car. As Chaney began to drive away, King once again said "I'm going to get him," rolled out of the car, and ran back toward Branch with the knife.

As the police arrived, King saw the flashing lights and threw the knife down the alley. Police Officer Gerald Morgan saw King in the alley and saw him throw something with his right hand. As Officer Morgan took King into custody, he read King his *Miranda* rights and placed him in the back seat of the squad car. Officer Morgan commented to the other officer that there was another person down the alley. King interjected, "He'll wish I'd killed him." Branch was taken to the hospital. Officer Morgan later searched for the object thrown by King and found the knife.

As King was being driven to the police station by Police Captain Donald Page, the news came over the radio that Branch had been declared dead on arrival. One of the three chest wounds sustained by Branch had caused his death by perforating his aorta and causing massive bleeding.

Upon hearing the news, King commented, "I really fucked up this time." At the police station, King was again provided with a *Miranda* rights waiver. King told the investigators that he and Branch were fighting in Helmick's home, he grabbed a knife as the fight moved outside, and the two ended up on the ground. He told investigators he stabbed Branch as many times as he could.

Before a second interview, King told his half sister that he was sorry and that he had to do it. King was then again advised of his *Miranda* rights. King remarked, "I know what I did was bad, wrong," and "It's a good thing I didn't have a gun in the house. I'd have blown him away. He would have been history."

A hearing was held on the motion to suppress. Several police officers who investigated the incident testified that King did not appear intoxicated. The officers had had substantial contact with King for several years and each testified to their prior experiences with King when he had been drinking. The district court conclud-

ed that King knowingly, intelligently, and voluntarily waived his constitutional rights and that his confession was not rendered inadmissible by virtue of his intoxication.

A jury trial commenced on March 18, 1991. The first witness called by the State was the father of the victim. Among the State's exhibits was a picture of the victim and his son. In addition, a police officer and an assistant county attorney testified to their investigations of this crime. This testimony included the content of several statements made by the baby-sitter who was present in Helmick's home on the evening in question. The jury found King guilty of murder in the first degree, and the trial court entered judgment on the conviction. King was sentenced to life in prison. He now appeals.

I. *Whether King's Inculpatory Statements Were Properly Admitted as Evidence at Trial.* King first contends his inculpatory statements made during and after his arrest were illegally obtained and should not have been admitted as evidence at trial. He argues his *Miranda* waivers and his inculpatory statements were not made knowingly and voluntarily. Therefore, he contends the district court erred in failing to suppress his statements.

 When a defendant is alleging error involving a constitutional right, such as here, we make an independent evaluation of the totality of the relevant circumstances to determine if such an error was made. *Rinehart v. State,* 234 N.W.2d 649, 658 (Iowa 1975); *State v. Jeffries,* 417 N.W.2d 237, 239 (Iowa App.1987). Our standard of review is de novo. *State v. Cullison,* 227 N.W.2d 121, 126–27 (Iowa 1975). Because the voluntariness of a *Miranda* waiver and the voluntariness of a confession are separate issues, *State v. Snethen,* 245 N.W.2d 308, 311 (Iowa 1976), we will address King's arguments separately.

 A. Waivers of Miranda Rights. We first address King's argument that the waivers of his *Miranda* rights were not given knowingly and voluntarily. The burden is on the state to prove by a preponderance of the evidence that defendant's waiv-

er of his *Miranda* rights was made knowingly, voluntarily and intelligently. *See State v. Hahn,* 259 N.W.2d 753, 758 (Iowa 1977) (citations omitted). *Miranda* holds that a defendant may waive the rights effectuated in the warnings only if the waiver is made voluntarily, knowingly and intelligently. *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694, 724 (1966). This inquiry has two dimensions: "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410, 421 (1986).

██ However, an express waiver is not required. *State v. Davis,* 304 N.W.2d 432, 435 (1981). Rather, the validity of the waiver is to be based on particular facts and circumstances surrounding the giving of the Miranda warnings.

Here, the totality of the circumstances demonstrate that defendant's waiver of his *Miranda* rights was voluntary, knowing, and intelligent. The defendant does not claim that the waiver of his *Miranda* rights was the result of any coercion, intimidation or deception. Rather, defendant claims that the waiver was not valid because of his inability to have a full awareness of the rights relinquished by the waiver. Defendant argues that he was unable to give a valid waiver because of his alcohol consumption the night before and the morning of the murder.

The court does not agree that defendant was unable to give a valid waiver of his *Miranda* rights. Rather, we find that King was informed of his *Miranda* rights several times and each time he knowingly, voluntarily, and intelligently chose to waive them.

When King was taken into custody by Officer Morgan, he was first informed of his *Miranda* rights. Officer Morgan testi-

fied at the suppression hearing that he had made no observations that King was intoxicated. King was informed of his *Miranda* rights the second time after he was driven to the station by Captain Page. At the station, the *Miranda* rights were read to King and King responded that Page did not have to read the form because King already knew the *Miranda* warnings. Captain Page testified that, in light of his previous experiences with King, he did not appear to be intoxicated.

Finally, King was read his *Miranda* rights for a third time before he was questioned by Sergeant Frost, the investigating officer. Sergeant Frost read King the *Miranda* rights and asked King if he understood his rights. King responded "Yes I do, bud" and signed the waiver. Sergeant Frost testified that King had no difficulty communicating with him and that King did not appear intoxicated.

The mere fact that King was under the influence of alcohol at the time of waiving his *Miranda* rights does not render King's waiver involuntary. *State v. Jackson*, 387 N.W.2d 623, 628 (Iowa App.1986). In sum, under the totality of circumstances, we find that the State has satisfied its burden of proving that King was capable of understanding and knowingly waiving his *Miranda* rights.

■ B. Voluntariness of the Inculpatory Statements. We next address King's contention his inculpatory statements were made involuntarily. To be admissible as evidence, incriminating statements made by a defendant must have been made voluntarily. *State v. Cullison*, 227 N.W.2d 121, 127 (Iowa 1975). The State bears the burden of establishing, by a preponderance of the evidence, the statements were made voluntarily. *Id.*

■ A statement is made voluntarily if it is "the product of an essentially free and unconstrained choice, made by the defendant at a time when his will was not overborne nor his capacity for self-determination critically impaired." *State v. Snethen*, 245 N.W.2d 308, 315 (Iowa 1976). In *State v. Davis*, the Iowa Supreme Court stated "a[n] incriminating statement is not invol-

untary in the constitutional sense unless it can be established that it was extorted from the defendant by means of coercive activity." 446 N.W.2d 785, 789 (Iowa 1989) (citing *United States v. Rohrbach*, 813 F.2d 142, 144 (8th Cir.1987)). To be admissible, a confession must not have been extracted by threats of violence, nor obtained by any direct or implied promises, however slight, nor by any exertion or any improper influence. *State v. Hrbek*, 336 N.W.2d 431, 436 (Iowa 1983) (citations omitted).

> No one factor is determinative of the voluntariness of an admission ... Many factors bear on the issue of voluntariness. These include the defendant's age, experience, prior record, level of education and intelligence; the length of time the defendant is interrogated; whether physical punishment was used; defendant's ability to understand the questions; defendant's physical and emotional condition; whether any deceit or improper promises were used in gaining the admission; and any mental weaknesses the defendant may possess.... In the event the questioning was custodial, defendant's knowledge and waiver of his *Miranda* rights and the length of his detention would also be considered.

*Davis*, 446 N.W.2d at 789 (citations omitted).

King argues that the statements made were not voluntary based upon his level of alcohol consumption that evening. The court does not agree. The mere fact that King was under the influence of alcohol at the time of making the inculpatory statement does not render the statement involuntary. *State v. Wilson*, 264 N.W.2d 614 (Iowa 1978).

After considering these factors in light of the totality of the circumstances, we conclude the State has proven, by a preponderance of the evidence, King's inculpatory statements made during and after his arrest on November 20, 1990, were given knowingly and voluntarily.

■ II. *Whether King was Denied Effective Assistance of Counsel.* King also contends he was denied effective assistance

of counsel at his trial. He asserts he was prejudiced by the testimony of the prosecution's first witness, the victim's father, which was admitted without objection. The prejudice, he claims, resulted from the State's attempt to humanize the victim using pictures of the victim with his family and the father's testimony that Ed Branch "was happy. He always got along. The kids loved him, and he loved all of the kids." Finally, King contends his trial counsel failed to object to hearsay testimony given by police officers to explain their investigation.

Where the record on direct appeal is not adequate to permit us to resolve the issue, we preserve the defendant's claim for postconviction proceedings so the facts may be so developed. *State v. Koenighain*, 356 N.W.2d 237, 238 (Iowa App. 1984). This also gives the allegedly-ineffective attorney the opportunity to explain his or her conduct. *State v. Coil*, 264 N.W.2d 293, 296 (Iowa 1978).

We conclude there is an inadequate record for us to adjudicate the defense claim without counsel's explanation for his conduct. The failure to object to the father's testimony may be in keeping with the defense strategy which only defense counsel can explain. We therefore preserve defendant's ineffective assistance of counsel claim for a later proceeding.

The costs of this appeal are taxed to King.

For all the reasons stated, the judgment of the district court is affirmed.

AFFIRMED.